UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:20-CR-31-TAV-HBG |
| | ) | |
| ROBERT Z. WHIPPLE, III, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the District Court's Order of Referral [Doc. 38], to address Defendant's Motion to Suppress Evidence [Doc. 35], filed on June 29, 2020.

The Court conducted an evidentiary hearing on Defendant's motion to suppress on July 27, 2020. Assistant United States Attorney ("AUSA") LaToyia Carpenter appeared on behalf of the Government, while Attorney Forrest Wallace represented the Defendant, who was also present. At the conclusion of the testimony, the Court took the matter under advisement and allowed the parties the opportunity to file post-hearing briefs. Defendant subsequently filed a post-hearing brief on the suppression of evidence on August 14, 2020. [Doc. 47].

Accordingly, after reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that Defendant's Motion to Suppress [Doc. 35] be denied.

**I.      INTRODUCTION**

Defendant seeks [Doc. 35] to suppress all evidence obtained following a warrantless search of his hotel room and person that occurred on March 7, 2020, as well as all evidence subsequently

obtained which derived from this search. First, Defendant states that he was investigated by law enforcement involving three bank robberies that occurred in Knoxville, Tennessee on March 5, 6, and 7, 2020, and challenges the warrantless search and seizure of his hotel room at the Red Roof Inn, located at 1315 Kirby Road, Knoxville, Tennessee, on March 7, 2020. Defendant asserts that law enforcement did not have probable cause to perform a forced entry of his room, and no exceptions to the warrant requirement are applicable.

Next, in addition to the warrantless search of his hotel room, Defendant challenges the items subsequently seized during execution of search warrants of his hotel room and vehicle—both executed on May 7, 2020. Defendant also challenges the execution of the search warrant for his seized cellular phone, a black Motorola Model XT1962-1 Smartphone, on May 10, 2020. Defendant claims that probable cause did not exist for the warrants for his hotel room, vehicle, and cell phone after excluding the evidence that was impermissibly obtained from the initial warrantless entry into his hotel room. Moreover, Defendant asserts that the subsequently obtained search warrants were not valid due to law enforcement's knowledge that the articles of clothing allegedly worn during the commission of the bank robberies, such as the white sneakers and light-colored shorts, would be found in Defendant's hotel room after the impermissible warrantless search.

The Government responds [Doc. 41] that the entry into Defendant's hotel room was lawful, and that the subsequently obtained search warrants for Defendant's hotel room, vehicle, and cell phone were all searched pursuant to valid search warrants, which law enforcement relied on in good faith. First, the Government claims that law enforcement properly entered Defendant's hotel room under a belief that the destruction of evidence was imminent, and then lawfully seized the

2

evidence on his person. Next, the Government claims that notwithstanding the facts obtained after law enforcement entered Defendant's hotel room, the search warrant affidavits established probable cause to later search Defendant's hotel room, cell phone, and vehicle. Lastly, the Government argues that the good faith exception is applicable in this case because the search warrants were not facially deficient and were reasonably relied upon by law enforcement.

In his post-hearing brief [Doc. 47], Defendant alleges that law enforcement's warrantless entry into his hotel room on March 7, 2020 was not justified under the exigent circumstances exception to the warrant requirement. Defendant claims that law enforcement was unaware of what was occurring inside of his hotel room, as no noises were heard coming from the room prior to Special Agent Leatham using a key card to conduct a warrantless entry of the hotel room. Defendant maintains that silence does not create an exigent circumstance, and there was no proof that he was destroying evidence or arming himself.

Additionally, Defendant argues that the good faith exception does not apply in the present case, as law enforcement deliberately failed to apply for a search warrant of Defendant's hotel room. Defendant also claims that following the warrantless entry into his hotel room, law enforcement's "knowledge that [the] clothing purportedly worn during commission of these bank robberies was preset in the room to be search was baked in the search warrant affidavits." [*Id.* at 10].

## II.    TESTIMONY AT THE EVIDENTIARY HEARING

At the July 27 hearing, the Government presented the testimony of Federal Bureau of Investigation ("FBI") Special Agent Wesley Leatham ("SA Leatham"). Defendant presented no witnesses. The Government also introduced a Google Maps satellite image of the Red Roof Inn

3

as Exhibit 1; a photograph of the window of Defendant's hotel room as Exhibit 2; a photograph of the parking lot of the Red Roof Inn as Exhibit 3; a photograph of the hallway leading to Defendant's room as Exhibit 4; the affidavit for the search warrant of Defendant's hotel room as Exhibit 5; the affidavit for the search warrant of Defendant's vehicle as Exhibit 6; and the affidavit for the search warrant of Defendant's cell phone as Exhibit 7. Defendant introduced a photograph of the clothing in the room taken during the execution of the search warrant of Defendant's hotel room as Exhibit 8, as well as a photograph of the bed in the room taken during the execution of the search warrant of Defendant's hotel room as Exhibit 9. The Court summarizes the witness's testimony and introduced exhibits as follows.

The Government first presented the testimony of SA Leatham, who has been employed with the FBI for over eleven years and is currently the Bank Robbery Coordinator for the Knoxville division, as well as a member of the Evidence Response Team. SA Leatham testified that he led an investigation into three bank robberies in Knoxville in March 2020. SA Leatham stated that the first robbery occurred on March 5, 2020 at the Home Federal Bank located at 1700 Downtown West Boulevard, the second robbery occurred on March 6, 2020 at the First Horizon Bank located at 1815 Downtown West Boulevard, and the third robbery occurred on March 7, 2020 at the Fifth Third Bank located at 8331 East Walker Springs Lane.

Additionally, SA Leatham testified that he reviewed the surveillance video of all three robberies, and for the first two robberies, he identified a lone white male with a large build enter the bank with a red rain poncho with the hood covering his head, khaki cargo shorts, and white tennis shoes. For the third robbery, surveillance videos indicated what appeared to be the same individual wearing a tan Dickies brand jacket with the hood up, a brown ladies wig under the hood,

4

and the same white tennis shoes from the previous robberies. SA Leatham testified that he interviewed the victim tellers from all three robberies. The first teller advised that she saw the man enter the bank, and he approached the counter carrying a 9' by 12' manila envelope with his right hand inserted into the envelope, to where she believed that he may have a handgun inside of the envelope. Next, the teller stated that the individual slid an envelope over to her, which contained a demand note, and she complied—removing U.S. currency from her drawer and placing it in the envelope. SA Leatham testified that his review of the surveillance video matched the account of the bank taller.

Next, SA Leatham detailed that the teller from the second bank robbery was interviewed by other agents. The teller stated that he saw a white male wearing a red rain poncho enter the bank carrying an approximate 9' by 12' manila envelope, and he then approached and provided the envelope to the teller, which contained a demand note for cash. The teller complied with the note and provided U.S. currency to the suspect, who exited the bank. SA Leatham testified that his review of the surveillance video matched the description provided by the teller.

Lastly, SA Leatham testified that the third victim teller stated that she observed a male enter the bank with a tan jacket, and the hood over his head, while wearing a believed women's wig. The teller detailed that the individual initially had both hands in his pocket, and upon reaching the counter, he placed a 9' by 12' manila envelope on the counter—while keeping his left hand in his jacket pocket. The envelope contained a note demanding cash, the teller provided cash from her drawer, and the individual then left the bank. SA Leatham stated that during the interview, the third victim teller was very scared and shaken by the incident.

SA Leatham then testified that during the second robbery, a bank employee witnessed the

suspect get into a silver Buick Enclave SUV parked in the bank parking lot, drive to an adjacent parking lot, and then flee on foot. When Knoxville Police Department ("KPD") officers responded to the scene, the vehicle had two different Virginia license plates attached to the front and back of the vehicle, and further investigation revealed that the vehicle had been stolen from an auto repair shop that was in close proximity to the banks from the first two robberies. SA Leatham stated that surveillance video captured the theft of the vehicle, and after reviewing the video, he determined that the same individual that had stolen the vehicle was responsible for the two bank robberies. SA Leatham detailed that he reached this conclusion based upon a similar physical description and clothing (khaki cargo shorts and white tennis shoes) from the earlier two bank robberies.

Next, SA Leatham stated that at the conclusion of the third robbery, after law enforcement noticed that the suspect was wearing a Dickies brand jacket and had changed his clothing from the first two robberies, they conducted an Internet search of retail outlets selling these jackets. SA Leatham detailed that a Walmart near the banks at issue sold this brand of jackets, law enforcement met with Walmart security personnel, and then asked the security personnel to conduct a search of Dickies brand jackets and rain ponchos that had recently been purchased. Security personnel at the store were able to locate a receipt from March 2, 2020 where a poncho, manila envelopes, black pens, and other items were purchased, and a review of the surveillance video from the time of purchase appeared to match the suspect from the bank robberies. Additionally, security personnel stated that the suspect had used his cell phone and a Walmart pay application on his phone to purchase these items. SA Leatham testified that law enforcement served a subpoena on Walmart to obtain the purchaser information, which identified the account holder as the Defendant, Robert Whipple.

6

At this point, SA Leatham testified that law enforcement also reviewed the surveillance video from the time of purchase to find the suspect approaching the Walmart in a yellow Dodge Challenger, enter the store wearing the same white tennis shoes, and purchase several items—including a red poncho and manila envelopes—at a self-checkout counter. Law enforcement then ran Tennessee driver's license, vehicle registration, and NCIC criminal history inquiries on Defendant, located all three records, and SA Leatham reviewed all three inquiries. SA Leatham testified that Defendant's physical description, as well as facial characteristics, matched the suspect from the robberies and vehicle theft, that Defendant had registered a 2018 Dodge Challenger, and that he was on parole due to his criminal history.

When describing how law enforcement located Defendant, SA Leatham stated that the FBI broadcast Defendant's information to the KPD, a detective advised that the KPD had stopped Defendant in the Dodge Challenger about a month prior, and officers then began searching the local area for this vehicle. A KPD officer then alerted that he had observed the vehicle parked in the rear parking lot of the Red Roof Inn located on Kirby Road. SA Leatham testified that he had several conversations with the U.S. Attorney's Office, that he, along with his supervisory agent, spoke with an Assistant United States Attorney, and that law enforcement believed it would be best to take Defendant into custody as soon as possible due to their investigation of a three-day crime spree. Additionally, SA Leatham noted that due to one of the victim tellers' belief that Defendant may have had a handgun and Defendant's parole status, law enforcement believed that he was a threat to public safety. SA Leatham testified that law enforcement believed probable cause existed that Defendant had committed several felonies, and decided to conduct a warrantless arrest if they were able to locate Defendant.

7

SA Leatham stated that law enforcement located Defendant's vehicle at approximately 6:30 p.m. on March 7, 2020. SA Leatham and another agent then made contact with the front desk clerk of the hotel, and the clerk checked the hotel's registration records to see if Defendant was a guest at the hotel. At this time, multiple law enforcement vehicles were present at the scene, with approximately both four to five marked and unmarked vehicles. The hotel clerk confirmed that Defendant was staying in Room 354 and provided SA Leatham with a room key. SA Leatham detailed that he requested for the hotel clerk to call Defendant's hotel room and ask him to come to the front desk after officers were in place in front of Defendant's room. The hotel clerk subsequently called Defendant, confirmed to SA Leatham that he had spoken to Defendant, and that Defendant stated that he would be down in a few minutes.

Next, SA Leatham testified that law enforcement waited approximately ten minutes outside of Defendant's room, Defendant did not leave the room, and that law enforcement did not hear any movement inside of Defendant's room. SA Leatham stated that at this point, his fear was that Defendant was aware of their presence and had potentially seen law enforcement vehicles enter the parking lot or heard radio traffic from the hallway, and that law enforcement was afraid that Defendant was either destroying evidence from the bank robberies or potentially arming himself. The Government introduced as Exhibit 1 a satellite image of the Red Roof Inn, and SA Leatham testified that he entered from Papermill Road, and went through the parking lot to the front desk. When discussing Exhibits 2 and 3—photographs of the outside of Defendant's room—SA Leatham testified that Defendant's vantage point led to their determination that Defendant may have been able to see law enforcement from his window.

SA Leatham detailed that he was afraid that Defendant was potentially destroying the

8

demand note, the taken U.S. currency, or a cell phone used during this time. SA Leatham testified that he planned to unlock the door with the key card, use a trash can to block the door open and verbally call Defendant out of the room. SA Leatham stated that he then used the provided key card to unlock Defendant's door, but the safety latch was engaged to where the door only opened approximately two inches. SA Leatham gave a loud verbal announcement that he was with the FBI and directed Defendant to come to the door, but there was no verbal response, SA Leatham repeated this announcement, and then heard movement and commotion inside of the room. SA Leatham testified that he was concerned that evidence was being destroyed or that Defendant was retrieving a firearm. Law enforcement then forced the door open and proceeded into the hotel room.

SA Leatham testified that there were two beds in the room, with females on each bed, and Defendant was on the ground beside one of the beds and was bent down where he looked to be retrieving something. After Defendant was instructed to show law enforcement his hands, he came up with a cell phone and a believed key fob in his other hand. The Government introduced as Exhibit 4 a picture of the inside of Defendant's hotel room, and SA Leatham detailed that Defendant was by the bed closest to the window.

SA Leatham stated that before entering the room, he was concerned about both the safety of law enforcement and the safety of others due to the nature of Defendant's three-day crime spree that did not be appearing to be stopping and was potentially escalating. SA Leatham testified that law enforcement's concern about the danger to the public, as well as the other guests in the hotel, led to their plan to open the door and call out to Defendant. Additionally, SA Leatham stated that at that time, they had not concluded whether Defendant had a gun, and at least one of the victim

9

tellers told him that she believed that Defendant may have had a gun.

After law enforcement entered the room and contacted Defendant, he was taken into custody without incident, and the hotel room was secured in order to obtain a search warrant. SA Leatham testified that Defendant matched the physical characteristics from the suspect on the surveillance videos of the banks. The Government then introduced SA Leatham's Affidavit in support of the search warrant of Defendant's hotel room as Exhibit 5. With respect to the portion of the Affidavit that included facts obtained after law enforcement had entered Defendant's hotel room, SA Leatham highlighted that a portion of Paragraph 27, and then Paragraph 28, were the only included facts that were gathered after law enforcement entered Defendant's hotel room. *See* [Exh. 5 at ¶¶ 27–28].

SA Leatham detailed that after law enforcement executed the search warrant for Defendant's hotel room, they collected several items of clothing—including white New Balance tennis shoes and khaki cargo shorts—as well as $3,500 in U.S. currency that was inside the pocket of a pair of blue jeans, a blue baseball cap, a red polo short, a hotel receipt in Defendant's name, a white rock like object that was suspected to be crack cocaine, and two baggies of white powder that was suspected to be another controlled substance. Law enforcement seized these items and impounded Defendant's vehicle to be secured for the application of a search warrant.

The Government introduced SA Leatham's Affidavit in support of the search warrant for Defendant's yellow Dodge Charger as Exhibit 6. SA Leatham similarly testified that Paragraphs 38 and 39 were the only sections that included facts gathered after the warrantless entry into Defendant's hotel room. SA Leatham stated that an Ozark Trail red rain poncho was found in the trunk of the vehicle, as well as that a brown wig and beard costume kit, a 9' by 12' manila envelope

10

with a demand note, an open package of manila envelopes, black gel pens, a tan Dickies jacket, a cellular telephone, a rock like substance believed to be crack cocaine, and First Horizon bank receipts were also found in the vehicle. Law enforcement seized these items under the obtained search warrant. SA Leatham then obtained a search warrant for the stolen Buick Enclave SUV used in the robbery of the First Horizon bank, as well as for the cell phone seized from Defendant's person upon his arrest. Lastly, the Government introduced SA Leatham's Affidavit in support of the search warrant for Defendant's cell phone as Exhibit 7, and SA Leatham highlighted Paragraphs 38 and 39 as being the only facts gathered as a result of entering Defendant's hotel room. SA Leatham testified that law enforcement has attempted to search Defendant's cell phone, and it has currently been sent to the FBI headquarters.

On cross-examination, SA Leatham stated that he, along with the other members of law enforcement, did not immediately barge in Defendant's hotel room because they wanted to confirm if it was him and allow the opportunity for Defendant to exit the room. Additionally, SA Leatham testified that law enforcement waited approximately ten minutes after the phone call was placed by the hotel clerk, and that during this time he did not hear any noise, voices, or cell-phone activity. SA Leatham stated that law enforcement was placed along the wall of the hallway leading to Defendant's room. SA Leatham testified that he thought that Defendant may have been aware of their presence because of the potential ability to see law enforcement out of the window of his hotel room or hear radio traffic.

Next, SA Leatham testified that he could not recall hearing any police radio traffic in the hallway or whether the shades were open or down in Defendant's room, although they were drawn in the photograph introduced as Exhibit 4. SA Leatham stated that during the approximate ten-

11

minute period of silence before entering Defendant's hotel room, he did not hear anything to suggest the destruction of evidence or that Defendant was arming himself. SA Leatham testified that he used the room key to enter Defendant's room originally for officer safety reasons. Additionally, SA Leatham detailed that in the estimated thirty second period between the period when the door was slightly ajar and fully open, he was surprised that the door was latched, and law enforcement reformed to breach the door. SA Leatham stated that there was a two-inch opening in the door and that he could not see within the room, but that he informed Defendant that he was with the FBI and directed him to come to the door.

SA Leatham testified that he did not hear any toilet flushing or any voices during this time period. With respect to his answer on direct that he heard movement and commotion, SA Leatham stated that he heard someone hurriedly moving within the room at this time. SA Leatham testified that he was unaware of how many occupants were within the room, and that he did not hear the bathroom door close. Next, SA Leatham stated that upon entering the room, Defendant was bent over the far bed and appeared to be retrieving something, which turned out to be a cell phone.

Defendant introduced a photograph of several items of clothing taken during the execution of the search warrant of the hotel room as Exhibit 8. SA Leatham testified that the items of most interest were the white tennis shoes, the baseball hat seen in the surveillance videos of the theft of the Buick Enclave, blue jeans, and a pair of white khaki shorts. SA Leatham stated that upon entering the hotel room, law enforcement performed a protective sweep of the room, and that he did not recall any officers pointing out those articles of clothing. SA Leatham testified that prior to the search warrant execution, he did not see these items on the floor of the hotel room. SA Leatham stated that he, along with another officer, detained Defendant upon entering the hotel

12

room after Defendant was instructed to get on the ground towards the foot of the bed. SA Leatham testified that at one point during the entry of the hotel room, one of the officers would have gone into the corner of the room where these items of clothing were located. Lastly, SA Leatham confirmed that he had no knowledge of these items during the initial entry of Defendant's hotel room.

Defendant introduced another photograph of the first bed in the hotel room, taken during the execution of the search warrant, as Exhibit 9. SA Leatham stated that the cell phone laying on the bed in the photograph was not the phone in Defendant's possession when law enforcement entered the room. SA Leatham testified that one of the females in the room was arrested on an outstanding state warrant, while the other female was released after being interviewed.

Next, SA Leatham testified that Defendant was not permitted to put on shoes prior to being taken into custody. SA Leatham stated that law enforcement was going to be looking for shoes worn during the bank robberies and auto theft, and that he was requesting to search for white tennis shoes in his search warrant. SA Leatham detailed that upon law enforcement's entry to the hotel room, the two females were very surprised and concerned but he could not say whether they were in fear, although Defendant did not appear to be a threat to them. With respect to the $530 found on Defendant's person, SA Leatham stated that he suspected that this money came from one of the bank robberies—likely the robbery from earlier that day where the suspect was given $100 and $50 bills—but that law enforcement was unable to confirm this information because no bait bills were provided.

## III.  ANALYSIS

### A.  Warrantless Entry of Defendant's Hotel Room

13

Defendant claims that law enforcement impermissibly entered his hotel room without a warrant, and a sufficient exigency did not exist to justify this warrantless entry. Defendant maintains that SA Leatham testified that he did not hear anything prior to entering Defendant's room through the use of the key card, thus there was no evidence that Defendant was destroying evidence or arming himself. Defendant acknowledges that although bank robbery is an inherently dangerous crime, he claims that there was no testimony that any victim tellers saw the suspect with a weapon, and the allegation of the crime is not sufficient to create an exigency.

The Government responds that law enforcement clearly had probable cause to arrest Defendant and believed that Defendant was aware of their presence and intentionally attempting to avoid law enforcement. Additionally, the Government claims that law enforcement was concerned that Defendant was attempting to destroy any evidence inside of the hotel room or locating a weapon. The Government notes that after SA Leatham used the key card to open the hotel room, law enforcement heard movement in the room, and there was no verbal response from Defendant. Therefore, the Government claims that the warrantless entry was valid given the exigent circumstances of the imminent destruction of evidence and the risk of danger to law enforcement.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Searches must be pursuant to a warrant, which "shall issue [only] upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 585 (1980). "The Fourth Amendment's full complement of protections

14

also applies to hotel rooms." *United States v. Gordon*, 339 F. Supp. 3d 647, 655 (E.D. Mich. 2018) (citing *United States v. Riley*, 858 F.3d 1012, 1018 (6th Cir. 2017) (additional internal citation omitted)).

"Because the physical entry of the home is the chief evil against which the Fourth Amendment is concerned, a search of a residence or a hotel room conducted without a warrant is per se unreasonable unless the police can show that the search falls within one the carefully defined exceptions to the warrant requirement." *Id*. In general, exigent circumstances exist when "'real immediate and serious consequences' will 'certainly occur' if a police officer postpones action to obtain a warrant." *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984)). The Sixth Circuit has identified the emergency situations giving rise to the exigent circumstances exception requirement as: (1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; or (4) a risk of danger to the police or others. *Id.* (citing *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)).

Courts have repeatedly recognized that law enforcement officers may conduct a home search without a warrant to prevent the imminent destruction of evidence. *See, e.g.*, *Missouri v. McNeely*, 569 U.S. 141, 149 (2013); *Cupp v. Murphy*, 412 U.S. 291, 296 (1973); *United States v. Ray*, 577 F. App'x 526, 531 (6th Cir. 2014); *United States. v. Haddix*, 239 F.3d 766, 768 (6th Cir. 2001); *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984). The Government has the burden to demonstrate the existence of exigent circumstances sufficient to except law enforcement from complying with the warrant requirement. *Id.* at 1162.

15

However, the Court finds that the Government has not demonstrate sufficient exigent circumstances to justify law enforcement's warrantless entry into Defendant's hotel room. First, law enforcement's use of the key card to open the door to Defendant's room, prior to the door being latched shut, constitutes a warrantless entry. *See, e.g.*, *United States v. Ramirez*, 676 F.3d 755, 760–63 (8th Cir. 2012) (analyzing whether exigent circumstances existed to justify warrantless entry into a hotel room when officers used a key card to obtain entry into the room under similar circumstances); *United States v. Estrada*, No. 1:11-CR-101 TS, 2012 WL 2367992, at *6 (D. Utah June 21, 2012) (same).

The Court finds that prior to law enforcement using the key card to open Defendant's hotel room, there was not sufficient evidence to believe that the destruction of evidence was imminent or that Defendant presented a danger to law enforcement or other individuals. In an analogous case, the Eight Circuit held in *Ramirez* that no exigent circumstances existed when law enforcement attempted to gain entry into a hotel room by swiping a provided key card, as "they had no indication whatsoever that there was any activity at all in the hotel room, let alone any activity that might lead them to believe that the occupants inside might imminently destroy evidence," as in fact, the officers heard "no sounds at all" from the room. 676 F.3d at 763.

Here, SA Leatham testified that during the approximate ten-minute period between when the hotel clerk called Defendant and when he inserted the hotel key card, he did not hear anything to suggest that evidence was being destroyed or that Defendant was arming himself. *See, e.g.*, *United States v. Parker*, No. 16-CR-22, 2016 WL 11448315, at *5 (E.D. Wis. Aug. 15, 2016) ("Agent McCarthy testified that during the time of knocking and announcing prior to entering the room [through a key card, and subsequent ram to breach the door after a safety latch] he did

16

Case 3:20-cr-00031-TAV-JEM    Document 50    Filed 09/14/20    Page 16 of 29
PageID #: 347

not hear any sounds coming from the room including any yelling or toilets flushing. On this record, the government has failed to show that 'the officers had an objectively reasonable basis for believing that evidence, namely heroin was being destroyed inside the hotel room.'"), *report and recommendation adopted in relevant part by*, 2016 WL 5957566 (E.D. Wis. Oct. 14, 2016). While SA Leatham testified that he believed that Defendant was potentially aware of the presence of law enforcement, this claim is weakened by the lack of any resulting sounds indicating that evidence was being destroyed.

The Government, however, points to SA Leatham's testimony that he heard movement and commotion after opening the door to approximately two inches with the safety latch engaged and announcing that he was with the FBI. In *Kentucky v. King*, the Supreme Court held:

> [T]he answer to the question before us is that the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.

563 U.S. 452, 462 (2011). In *King*, the Supreme Court addressed where law enforcement "knock and announce their presence, hear the sound of movement inside, indicating the possible destruction of evidence, and then enter the home without a warrant to prevent that destruction." *United States v. Manubolu*, --- F. Supp. 3d ---, 2020 WL 4604499, at *19 (D. Me. Aug. 10, 2020); *see also King*, 563 U.S. at 469 (holding a determination whether the conduct of the police preceding the exigency is reasonable based on a consideration of objective factors, rather than the subjective intent of law enforcement).

17

However, in the present case, law enforcement "'threaten[ed] to engage in conduct that violates the Fourth Amendment,' when they attempted to enter the room with the key card." *See, e.g.*, *United States v. Estrada*, No. 1:11-CR-101 TS, 2012 WL 2367992, at *6 (D. Utah June 21, 2012) (quoting *King*, 563 U.S. at 462) ("However, in reality, *King* directly forecloses the argument that the sounds heard by the officers' in this case after they announced their presence justified a warrantless entry under the exigent circumstances doctrine . . . [A]ny destruction of evidence demonstrated by the deadbolt locking and running sounds inside the room was the result of police created exigency and cannot be considered by the Court."). Rather than merely knocking and announcing their presence at the door, law enforcement impermissibly attempted to enter Defendant's hotel room.

With respect to the risk of danger to law enforcement or public safety, SA Leatham testified that he was not aware of the presence of any other individuals inside of the hotel room. *See United States v. Bass*, 41 F. App'x 735, 739 (6th Cir. 2002) (finding a lack of exigent circumstances to justify a warrantless search of the defendant's hotel room as "[t]here was no evidence that there would be any persons or other dangers in Bass's hotel room"). While the Government points to SA Leatham's testimony that one victim teller believed that Defendant may have had a gun, law enforcement had not witnessed Defendant with a firearm in any surveillance videos. *Cf. United States v. Davis*, No. 2:05-CR-28, 2005 WL 2088591, at *6 (E.D. Tenn. Aug. 22, 2005) ("What differentiates the facts in *Bass* from the facts of the case before this Court is the presence of a gun. The Morristown police officers saw defendant brandishing a gun all through the night, and that gun was not found on him after his arrest. Thus, the gun had to be in the motel room."), *report and recommendation adopted by*, 2005 WL 2088593 (E.D. Tenn.

18

Aug. 26, 2005). Moreover, prior to entering the hotel room, law enforcement did not hear any sounds potentially indicating that Defendant was arming himself.

Lastly, the Government has also failed to articulate any basis for law enforcement to believe that any other hotel guests were in imminent danger, as several members of law enforcement had blocked off Defendant's room. *See Bass*, 41 F. App'x at 739 ("From the totality of the circumstances, the Court can find nothing that would have led the police officers to any reasonable belief that the other hotel guests were in any imminent danger at the time they searched Bass's hotel room.").

Therefore, for the reasons set forth above, the Court finds that the Government has failed to establish that immediate police action was necessary to prevent the destruction of evidence or prevent harm to law enforcement or the public.

## B.    Resulting Search Warrants

Alternatively, the Government claims that even if the facts obtained after law enforcement impermissibly entered Defendant's hotel room are excluded, the search warrant affidavits established probable cause to later search Defendant's hotel room, cell phone, and vehicle. Additionally, the Government asserts that "[b]ecause the facts provided in the vehicle search warrant and cellular phone search were acquired while executing the validly obtained hotel room search warrant, any evidence obtained during the execution of the vehicle and cellular phone search warrants were also lawfully seized." [Doc. 41 at 9].

Defendant's arguments center on the potential for law enforcement to observe the clothing allegedly worn during the vehicle theft and bank robberies while impermissibly entering Defendant's room, mainly the white tennis shoes, the baseball hat seen in the surveillance videos

19

of the theft of the Buick Enclave, blue jeans, and a pair of white khaki shorts, as "the knowledge that clothing purportedly worn during the commission of these bank robberies was present in the room to be searched was baked in the search warrant affidavits." [Doc. 47 at 10]. Defendant notes that SA Leatham "testified that he did not see any of Defendant's clothing which was piled up on the floor of a one-bedroom hotel," even though officers performed a protective sweep and "these items arguably matched the description of the clothing worn by the robbery suspect during the bank robberies." [*Id.* at 9]. Additionally, Defendant points to the fact that "[w]hen Defendant was escorted out of the room, he was barefoot, even though a pair of men's white tennis shoes were on the floor." [*Id.*]. Therefore, Defendant claims that when SA Leatham "applied for various search warrants at issue based on facts [that] were corroborated when he erroneously entered Defendant's hotel, whether these items would in fact be present in Defendant's room upon a more detailed search . . . became self-fulfilling." [*Id.* at 9–10].[1]

Under the Fourth Amendment, there must be probable cause for a search warrant to issue, and the warrant must be based on facts that demonstrate "a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)); *see also United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) ("An issuing judge may find probable cause to issue a search warrant when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (quoting *United States v. Laughton*, 409

---

[1] The Court notes that prior to SA Leatham's testimony at the suppression hearing, Defendant specifically addressed the independent source rule, claiming that "[o]nce Special Agent Leatham saw these particular items of clothing, they became an integral part of his descriptions of all three robberies in all three warrants, along with the U.S. currency found on Whipple's person." [Doc. 35 at 8].

F.3d 744, 747 (6th Cir. 2005)). "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). There must be a "nexus between the place to be searched and the evidence sought." *Id.* (quoting *United States v. Van Shutters*, 163 F.3d 331, 336–37 (6th Cir. 1998)).

In determining whether an affidavit establishes a nexus, the undersigned begins by observing that the issuing judge's determination that probable cause exists is entitled to "great deference." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. The "duty of a reviewing court is simply to ensure that the magistrate [judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238–39. In making this determination, the Court considers only the information that was before the issuing judge, *i.e*, only what is contained within the four corners of the supporting affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010); *see also Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971).

"'Under the fruit of the poisonous tree doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation.'" *United States v. Smith*, 386 F.3d 753, 763 (6th Cir. 2004) (quoting *United States v. Miller*, 146 F.3d 274, 280 (5th Cir. 1998)).

During the motion hearing, SA Leatham identified the following information in his Affidavit as including facts obtained after the entry into Defendant's hotel room:

> FBI agents forced entry inside the room and located WHIPPLE standing on the side of the hotel bed. They observed WHIPPLE reach underneath the bed before finally complying with the agents' request that WHIPPLE show his hands. Law enforcement also located drug paraphernalia items in plain view on the floor inside the room. WHIPPLE also had approximately $530 in cash in denominations of $100, $50, and $20 dollar bills in his pockets.
>
> Two females were also in the room. Law enforcement interviewed both the female occupants and showed the two females surveillance photos from the Fifth Third Bank robbery earlier that day. The females identified the defendant in the photographs and stated that they had seen the jacket worn by Robert earlier inside the hotel room.

[Exh. 5 at ¶¶ 27–28]. Thus, the Court cannot consider this information in its determination of whether sufficient probable cause existed for the search warrant of Defendant's hotel room, as "[t]he exclusionary rule prohibits introduction into evidence . . . of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988); *see also United States v. Calandra*, 414 U.S. 338, 347–48 (1974) (stating the exclusionary rule provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure").

"The exclusionary rule would therefore work to exclude all evidence obtained subsequent to and as a consequence of an illegal search because, as the fruit of a prior illegality, such evidence is tainted unless (1) the government learns of the evidence from an 'independent source;' (2) the connection with the unlawful search becomes 'so attenuated as to dissipate the taint;' or (3) the evidence 'would inevitably have been discovered.'" *United States v. McClain*, 444 F.3d 556, 564 (6th Cir. 2005) (internal citations omitted).

The independent-source doctrine "holds that evidence will be admitted if the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). Therefore, "evidence obtained pursuant to a search warrant that relied, in part, on unlawfully obtained information may nevertheless be admissible under the independent-source doctrine." *United States v. Chapman-Sexton*, 758 F. App'x 437, 440–41 (6th Cir.), *cert. denied*, 139 S. Ct. 2731 (2019). The Sixth Circuit detailed in *Jenkins* that "[i]f the application for a warrant 'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, providing that the officers were not prompted to obtain the warrant by what they observed during the initial entry.'" 396 F.3d at 758 (quoting *United States v. Herrold*, 962 F.2d 1131, 1141–42 (3d Cir. 1992)); *see also Murray v. United States*, 487 U.S. 533, 542 & n.3 (1988) ("To determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if what actually happened had not occurred . . . ."); *United States v. Allen*, 720 F. App'x 254, 258 (6th Cir. 2018) ("When there are two searches—an earlier illegal search and a later warrant search—evidence from the later search is from an independent source if the warrant application contains probable cause apart from the tainted information discovered during the first search.").

Upon review of the non-excluded information in the supporting affidavit to the search warrant, the Court finds that sufficient probable cause exists, even excluding the suppressed evidence, to justify the search warrant for Defendant's hotel room. The Court agrees with the Government's argument that a valid search warrant for Defendant's hotel room would subsequently provide that the evidence seized from Defendant's hotel room detailed in the search

23

warrants for Defendant's vehicle and cell phone was lawfully obtained.

Even excluding the included facts after the "forced entry" into Defendant's hotel room, SA Leatham's Affidavit details that Defendant was suspected of entering the Home Federal Bank on March 5, 2020 wearing a red rain poncho, light colored shorts, and white sneakers, carrying a manila envelope with his right hand partially inserted in the envelope; as well as that he was suspected of entering the First Horizon Bank on March 6, 2020 wearing a red rain poncho, light colored shorts, and white sneakers, carrying a manila envelope with his right hand partially inserted in the envelope; and that he was suspected. [Exh. 5 at ¶¶ 6, 10]. The Affidavit further details Defendant's alleged actions in robbing the two banks on March 5 and 6, 2020, and after review of the two surveillance videos, SA Leatham believed that the same individual had robbed both banks due to his wearing of similar clothing and use of a manila envelope. [*Id.* at ¶ 13]. Additionally, the Affidavit notes that a bank employee witnessed the suspect drive away in a Buick Enclave SUV and law enforcement's subsequent investigation of the robbery of the Buick Enclave. [*Id.* at ¶¶ 14-16].

Next, the Affidavit details the suspected robbery of the Fifth Third Bank on March 7, 2020 by a male wearing a dark brown colored jacket, a dark brown curly ladies' wig, and white sneakers, as well as that the individual used a similar manila envelope. [*Id.* at ¶ 18]. The Affidavit describes SA Leatham's review of the surveillance video of the third robbery, and law enforcement's belief that the suspect was the same from the earlier two robberies. [*Id.* at ¶ 20]. Additionally, the Affidavit details law enforcement's efforts to locate recent purchases of red rain ponchos at a local Walmart, where security personnel discovered a purchase made on March 2, 2020. [*Id.* at ¶ 21]. The Affidavit details how law enforcement was able to connect this purchase to Defendant through

24

their review of surveillance video showing him leaving in what appeared to be a yellow Dodge Challenger, as well as the Walmart pay application on his cellular telephone. [*Id.* at ¶¶ 21-22]. Moreover, the Affidavit details that law enforcement found Defendant's vehicle at the Red Roof Inn and confirmed that Defendant was a guest of the hotel. [*Id.* at ¶¶ 24–25].

As the Court previously detailed, Defendant asserts that "[o]nce Special Agent Leatham saw [the white colored tennis shoes, blue jeans and brown belt, light colored shorts, and a blue baseball cap in plain view in the hotel room], they became an integral part of his descriptions of all three robberies in all three warrants, along with the U.S. currency found on [Defendant's] person." [Doc. 35 at 8]. However, during the suppression hearing, SA Leatham testified that he was unaware of these specific items of clothing during his warrantless entry into Defendant's hotel room. Although SA Leatham's Affidavit details that Defendant was suspected of wearing these items of clothing during the preceding bank robberies, the Court finds that this information is not reliant on the illegal warrantless search of his hotel room.

In *United States v. Savoca*, the Sixth Circuit found that the fact that two individuals known to be involved in illegal activity were observed at the same location did not provide probable cause or establish a nexus that evidence of the bank robberies allegedly committed at an unspecified date would be found in a motel room. 761 F.2d 292, 297 (6th Cir. 1985). While ruling on the Government's petition for rehearing, the Sixth Circuit noted that the affidavit did not establish sufficient probable cause when it failed to "state when the robberies occurred and because the robberies occurred over halfway across the country," as well as that the affidavit "failed to describe the relationship of the persons to the premises." *Id.* at 298.

While *Savoca* has been cited to support that "the inference that bank robbers tend to conceal

evidence in motel rooms, standing alone, is insufficient to support the search of [the] hotel room," *see United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005), SA Leatham's Affidavit specifically detailed the temporal proximity of the three bank robberies and auto theft, stated that Defendant was identified as the suspect of the bank robberies through the Walmart subpoena and that his vehicle was present at the Red Roof Inn, and noted it was confirmed that Defendant had rented the hotel room at issue. Further, unlike in *Savoca*, the Red Roof Inn was in the same city as the bank robberies, and Defendant is alleged to have robbed three banks within a period of a short period of time as renting the hotel room.

Here, after excluding the information obtained from the warrantless entry into Defendant's hotel room, SA Leatham's Affidavit provides that after a review of the surveillance videos, the same individual was believed to have committed all three robberies, as well as the theft of the Buick Enclave. Next, the Affidavit states that law enforcement was able to identify Defendant as the suspect through their review of Walmart surveillance video and purchases. Lastly, the Affidavit details that Defendant was tied to the bank robberies through his purchases, vehicle theft, and registered Dodge Challenger, that Defendant's Dodge Challenger was subsequently found at the Red Roof Inn, and that law enforcement confirmed that Defendant had rented the hotel room.

Ultimately, SA Leatham's Affidavit provided a substantial basis to believe that Defendant had robbed the three banks and stolen the Buick Enclave, that Defendant had purchased items used in the commission of these bank robberies from a local Walmart, and that items used in the bank robberies, as well as evidence of the crime, could be found in the hotel room identified in the search warrant application. Therefore, the Court finds that SA Leatham's Affidavit is sufficient to establish "a fair probability" that evidence of the bank robberies would be found in Defendant's

hotel, even excluding the detailed challenged evidence obtained as a result of the impermissible entry. *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006).

As the Court previously detailed, the permissible search of Defendant's hotel room after obtaining a valid search warrant provides an independent source for the challenged information included in the affidavits in support of the search warrants for Defendant's vehicle and cell phone. Accordingly, the Court finds that any evidence obtained during the execution of the search warrants for Defendant's vehicle and cell phone was also lawfully seized.

### C.     Good Faith Exception

As the Court has found that the non-suppressed evidence set forth in the affidavit in support of the search warrant for Defendant's hotel room establishes probable cause, the undersigned will not conduct an extensive good faith analysis at this time. *See, e.g.*, *United States v. Wingate*, No. 16-CR-60-JMH, 2016 WL 5109517, at *4 (E.D. Ky. Sept. 20, 2016) ("In this case, by contrast, the Court need not consider *Leon* because it has already found that the 'independent source rule' saves the evidence from exclusion under the 'fruit of the poisonous tree' doctrine.").

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). However, if the evidence was "obtained in objectively reasonable reliance" on the "subsequently invalidated search warrant," then it should not be suppressed. *United States v. Leon*, 468 U.S. 897, 922, (1984). "[T]he decision to exclude evidence is divorced from whether a Fourth Amendment violation occurred." *United States v. Master*, 614 F.3d 236, 242 (6th Cir. 2010).

There is "an exception to the exclusionary rule where 'the officer conducting the search

acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate that subsequently is determined to be invalid.'" *United States v. Watson*, 498 F.3d 429, 431 (6th Cir. 2007) (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 987-88 (1984)). The good-faith exception will not apply where "the affidavit is 'so lacking in [indicia of] probable cause as to render official belief in its existence entirely unreasonable'" or "where the officer's reliance on the warrant was neither in good faith nor objectively reasonable." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005) (quoting *Leon*, 468 U.S. at 923).

The Court notes "conflicting authority, even within the Sixth Circuit, concerning whether the good faith exception can ever be applied when officers act pursuant to a search warrant obtained through information gained during an illegal predicate search." *United States v. Rounsaville*, No. 1:17-CR-69-HSM-SKL, 2018 WL 6177963, at *12 (E.D. Tenn. July 27, 2018), *report and recommendation adopted by*, 2018 WL 4909903 (E.D. Tenn. Oct. 10, 2018). However, the Sixth Circuit has found that "the good-faith exception applies, even if a warrant is based on an illegal predicate search, where 'the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable.'" *United States v. Fugate*, 499 F. App'x 514, 519 (6th Cir. 2012) (citing *United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005) and noting "[w]e are bound by *McClain*").

Therefore, if the District Judge finds that law enforcement did not have probable cause for the warrant of Defendant's hotel, the fruits of the search of Defendant's hotel room, including the subsequently obtained search warrants, would still be admissible because the evidence was discovered during the good-faith execution of seemingly valid warrants. Although the affidavit in

28

support of the search warrant for Defendant's hotel room included information from the impermissible entry into Defendant's hotel room, law enforcement had an objectively reasonable, good-faith belief in the validity of the search warrant, and the affidavit "disclosed 'the circumstances surrounding the initial warrantless search.'" *Rounsaville*, 2018 WL 6177963, at *13 (quoting *McClain*, 444 F.3d at 566). Further, SA Leatham's Affidavit was not so lacking in indicia of probable cause involving Defendant as to render law enforcement's belief unreasonable, and thus the reliance on the warrant was objectively reasonable.

## IV. CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the Court finds that the evidence seized from the searches of Defendant's hotel room, vehicle, and cell phone should not be suppressed. Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 35**] be **DENIED**.[2]

Respectfully submitted,

*Bruce Guyton*

United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).