IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:20-CR-31-KAC-HBG |
| | ) | |
| ROBERT Z. WHIPPLE, III, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for report and recommendation regarding disposition by the District Judge. In early March 2020, the Federal Bureau of Investigation ("FBI") identified Robert Whipple as a suspect in three bank robberies through an administrative subpoena to Walmart regarding a purchase on March 2, 2020, using the Walmart Pay application. Defendant Whipple was arrested in his hotel room at the Red Roof Inn on the evening of March 7, 2020, and a cellular telephone was seized from his person at the time of his arrest. Following Defendant's arrest, law enforcement impounded his car, which was parked in the hotel's parking lot. On the evening of Defendant's arrest, FBI Special Agent Wesley Leatham obtained a search warrant for Defendant's hotel room and executed the search warrant late that evening and into the early morning of March 8. Special Agent Leatham obtained search warrants for Defendant's car and cellphone on March 10, 2020. Law enforcement searched Defendant's car on March 11, 2020, and completed the data extraction from his cellphone on November 19, 2020.

Defendant asks the Court to suppress all evidence stemming from the administrative subpoena, the seizure of his car, and the search of his cellphone, arguing that this evidence was gained in violation of the Fourth Amendment. Specifically, Defendant argues the Court must suppress all evidence stemming from the warrantless search of his personal purchasing data from Walmart, which data ultimately led to his identification [Doc. 117]. He also contends law enforcement violated the Fourth Amendment with the warrantless seizure of his car, when no exigent circumstances were present [Doc. 112]. He asserts law enforcement searched and seized data from his cellular phone on November 18 through 19, 2020, well after the expiration of the fourteen-day period permitted in the search warrant [Doc. 115]. Finally, Defendant asks the Court to reopen the suppression issue relating to the search of his hotel room, arguing that the report of FBI Agent Paul Hughes contradicts Agent Leatham's testimony that he did not see the clothing on the floor of the hotel room before he obtained the search warrant [Doc. 116].

For the reasons stated herein, the Court finds the identification of Defendant through a subpoena and the search of Defendant's car and cellular telephone comport with the Fourth Amendment. Additionally, the Court finds no basis to reopen Defendant's challenge to the search of his hotel room. Thus, the undersigned respectfully recommends that the Defendant's motions to suppress evidence [Docs. 112, 115, 116, & 117] be denied.

## I.  BACKGROUND

On March 5 and 6, 2020, a heavy-set white male robbed two banks on Downtown West Boulevard in Knoxville, Tennessee.[1] In both robberies, the perpetrator wore a thin red rain

---

[1] The Court takes this background information from the affidavit of Special Agent Leatham supporting the Criminal Complaint [Doc. 1] and the testimony and exhibits at the first evidentiary hearing on July 27, 2020 [Doc. 52, Transcript]. At the second evidentiary hearing on May 17, 2021, the parties proffered the transcript of the first evidentiary hearing as background for the instant motions [*see* Doc. 137, Transcript, p.9].

poncho, light-colored shorts, white sneakers, and disposable gloves, and he carried a manila envelope with a handwritten demand note. On March 7, 2020, a third Knoxville bank was robbed by a white male with a large build wearing a tan jacket, a curly wig, blue jeans, and white sneakers. The robber produced a manila envelope with a demand note.

Law enforcement contacted a nearby Walmart and asked about recent purchases of red rain ponchos and tan Dickies-brand jackets. Walmart security personnel located a purchase made with the Walmart Pay application, at 10:15 a.m., on March 2, 2020, which included a red rain poncho, markers, and manila envelopes. Reviewing Walmart's surveillance video footage from that day and time, agents observed a white male with a large build and wearing white sneakers leave Walmart in a yellow Dodge Challenger. Through a subpoena to Walmart, law enforcement identified Robert Whipple as the person who made the March 2 transaction using the Walmart Pay application. Law enforcement reviewed Whipple's Tennessee driver's license records and observed that Whipple's photograph, height, and weight resembled the banks' surveillance footage of the robber. Tennessee vehicle registration records revealed a 2018 yellow Dodge Challenger, with license plate number CLN097, was registered to Robert Whipple.

On March 7, 2020, officers observed Whipple's Dodge Challenger parked in the rear parking lot of the Red Roof Inn in Knoxville, Tennessee. The hotel clerk told law enforcement that Robert Whipple was staying in room 354 and provided a key to that room. Law enforcement forced entry to the hotel room, arrested Whipple inside, and secured the room, while FBI Special Agent Wesley Leatham obtained a federal search warrant for the hotel room. The search warrant was issued at 10:58 p.m., and law enforcement executed the search warrant that night.

Law enforcement impounded the Dodge Challenger on March 7, 2020, and obtained a search warrant for the car on March 10, 2020. Officers searched the car pursuant to the search

3

warrant and seized a red rain poncho, a brown wig and beard costume kit, a manila envelope with a demand note, an opened package of manila envelopes, black pens, a tan Dickies jacket, suspected crack cocaine, and bank receipts. On March 10, 2020, law enforcement also obtained a search warrant for Whipple's cellular telephone, which was seized at the time of his arrest.

On March 17, 2020, the Grand Jury returned an Indictment [Doc. 8], charging Defendant Robert Whipple with three counts of bank robbery: Robbery of the Home Federal Bank on Downtown West Boulevard on March 5, 2020 (Count One); robbery of the First Horizon Bank on Downtown West Boulevard on March 6, 2020 (Count Two); and robbery of the Fifth Third Bank on Walker Springs Lane on March 7, 2020 (Count Three). Defendant moved to suppress all evidence derived from the warrantless entry of his hotel room and search of his person [Doc. 35]. The Court held an evidentiary hearing on this motion on July 27, 2020. The undersigned recommended that Defendant's motion be denied, determining that while the forced entry of the Defendant's hotel room violated the Fourth Amendment, the search warrant affidavit contained probable cause for a search warrant for the hotel room even excluding that evidence gained from the forced entry and, thus, the search pursuant to the search warrant arose from a source independent of any illegality [Doc. 55]. District Judge Thomas A. Varlan agreed with this conclusion, accepted the Report and Recommendation in whole, and denied Defendant's motion to suppress [Doc. 65].

Following the substitution of counsel, the Court permitted Defendant to file additional pretrial motions, including the four motions at issue here [Docs. 112, 115, 116, and 117]. The Government responded in opposition [Docs. 122, 124, 125, & 128]. The Court held an evidentiary hearing on these motions on May 17, 2021. Assistant United States Attorney LaToyia T. Carpenter appeared on behalf of the Government. Attorney Joshua D. Hedrick represented Defendant

4

Whipple, who was also present. The parties presented the testimony of three witnesses along with exhibits. The Court granted Defendant's request to file post-hearing briefs, which he filed on June 13, 2021 [Docs. 145-147]. The Government did not file any responding post-hearing briefs. Thereafter, the Court took the motions under advisement.

## II.  SUMMARY OF THE TESTIMONY

At the May 17, 2021 evidentiary hearing, the Government presented the testimony of FBI Special Agent Wesley Leatham ("SA Leatham") and FBI Digital Forensic Examiner Leyton Adams. Defendant called Jeffrey Davis, the front desk clerk at the Red Roof Inn.

Special Agent Wesley Leatham testified that he has worked for the FBI since April 2009 and is the lead case agent in this case [Tr. at 11].[2] He stated that on Saturday, March 7, 2020, he drafted and served a subpoena on Walmart, seeking transactional data and subscriber information, such as customer name, for a Walmart Pay application transaction in which an individual had purchased items that were used in several bank robberies [Tr. at 11-12]. In response to the subpoena, Walmart provided an email with a copy of the receipt from the transaction and a document with the name, address, and telephone number of the individual who made that purchase [Tr. at 12]. He said that this was the only information Walmart provided in response to the subpoena and that the subscriber's name was Robert Whipple [Tr. at 13-14].

SA Leatham stated that later that day, Saturday, March 7, 2020, law enforcement located the Defendant's yellow 2018 Dodge Challenger in the parking lot of the Red Roof Inn on Kirby Road in Knoxville, Tennessee [Tr. at 14-15]. The parking lot did not have a gate and could be accessed by the public [Tr. at 14]. That evening, following the Defendant's arrest, the Challenger was impounded and transported to the Knoxville Police Department's (KPD's) impound lot [Tr.

---

[2] The transcript of the May 17, 2021 evidentiary hearing was filed on May 28, 2021 [Doc. 137], and will be cited as "Tr."

at 15].  At the impound lot, the Challenger was secured while law enforcement applied for a federal search warrant [Tr. at 15].  SA Leatham testified that the KPD impound lot is fenced and that KPD staff man the gate to the impound lot around the clock [Tr. at 15].

SA Leatham said he decided to tow the Challenger to the impound lot, because law enforcement had probable cause to believe the car was used in the commission of three bank robberies [Tr. at 15-16].  In this regard, SA Leatham stated that law enforcement saw the Challenger on a Walmart surveillance video and believed it "more than likely" that the car contained evidence of the bank robberies [Tr. at 16].  SA Leatham said law enforcement also did not want to leave the car in the hotel parking lot, which was open to the public, because the car could be moved or the evidence stolen [Tr. at 16].  SA Leatham also testified that law enforcement impounded the Challenger so that they could search it in a controlled environment during daylight hours [Tr. at 16].  He stated that he did not seek a search warrant for the car on the evening of March 7, because his focus was on searching the hotel room, and he did not have time to draft two affidavits [Tr. at 18].  Finally, SA Leatham said he did not seek a search warrant for the Challenger that evening, because he wanted to release the KPD officers on the scene, as it was close to their shift change [Tr. at 18-19].

SA Leatham stated that before the Defendant's arrest, he told the front desk clerk that they were investigating Robert Whipple for bank robberies [Tr. at 16].  He said the hotel staff was aware that law enforcement was searching the Defendant's hotel room [Tr. at 16-17].  He said after they completed the search of the hotel room, he notified the front desk staff that they were done and the room was empty, and he returned the room key [Tr. at 17].

SA Leatham said Defendant Whipple had $530 on his person at the time of his arrest [Tr. at 17].  SA Leatham stated that just under $7,000 was taken in the three bank robberies, so at the

6

time of the Defendant's arrest, the police had not found a substantial portion of the stolen funds [Tr. at 17]. SA Leatham said he believed the Challenger possibly contained the remaining stolen currency [Tr. at 18]. He said law enforcement towed the Challenger to the impound lot, after the Defendant was arrested but before they got a search warrant for the hotel room [Tr. at 17-18]. Law enforcement did not conduct an inventory search of the car at the time it was impounded [Tr. at 20].

SA Leatham testified that following the search of the hotel room, he returned home around 2:00 a.m., on Sunday, March 8, 2020 [Tr. at 19]. He said that he returned to his office later that day and drafted affidavits in support of additional search warrants [Tr. at 19]. SA Leatham testified that he sent the affidavits to the United States Attorney's Office by email on Sunday evening and was notified of an appointment with a judge on Tuesday, March 10, at 3:30 p.m., to seek the search warrants [Tr. at 19]. He said he got the search warrant for the Challenger on Tuesday, March 10, around 2:45 p.m., and he executed the search warrant the following day, March 11, at around 9:00 a.m. [Tr. at 19-20]. SA Leatham said the officers found the following items in the Challenger: A red Ozark Trail poncho, a manila envelope with a robbery demand note written on the front, a package of unused manila envelopes, a Dickies jacket, a costume wig and beard, and "drug evidence" [Tr. at 20].

On cross-examination, SA Leatham stated that law enforcement came to the Red Roof Inn on March 7, because they located the Challenger in the parking lot [Tr. at 22]. He agreed that the car matched that associated with Defendant in make, model, color, and license plate number [Tr. at 22-23]. He agreed that the Red Roof Inn is next to another hotel and that the two hotels share an entrance and a parking lot [Tr. at 23-24]. However, SA Leatham stated that the Defendant's car was located behind the Red Roof Inn [Tr. at 24]. He agreed that the parking spaces were not

7

numbered or labeled [Tr. at 25].  He did not recall seeing any signs stating that unauthorized vehicles would be towed [Tr. at 26].

SA Leatham agreed that the front desk clerk told him which room was Robert Whipple's, he went to that room, and he eventually arrested Defendant in that room [Tr. at 26-27].  Defendant was taken into custody, and his car was towed to the impound lot [Tr. at 27].  SA Leatham stated that no one told him the car could not remain in the hotel parking lot, but based on his training and experience, he knew the vehicle should be kept in a secure lot such as the KPD impound lot [Tr. at 27].  After viewing a copy of the hotel receipt, SA Leatham agreed that Defendant had rented the hotel room from March 6 to March 9 and had two days left on the room rental at the time of his arrest [Tr. at 27-28].  SA Leatham agreed that one reason he had the car towed was to make sure that no one else entered it and that it remained accessible to law enforcement [Tr. at 28-29].  He said the main reasons that the car was towed is that he had probable cause to think the car was used in the commission of the crimes he was investigating and that it contained evidence of those crimes [Tr. at 29].

SA Leatham testified that the officers who remained to secure the hotel room, while he obtained the search warrant, were FBI personnel [Tr. at 30].  He said the KPD officers had been released by that time [Tr. at 30].  He said the car could not be seen from the Defendant's hotel room [Tr. at 30].  He agreed that even though it was late in the day, he still had to get a search warrant to search the hotel room [Tr. at 31].  SA Leatham said the affidavit for the search warrant for the hotel room was "largely similar" to the affidavit for the search warrant for the car [TR. at 31].  He said the affidavit supporting the search warrant for the car contained two attachments that were specific to the car [Tr. at 32, 35].  He stated that this affidavit also contained the following differences from the affidavit used to support the search warrant for the hotel room:  A sentence

8

stating the Challenger was impounded and transported to the impound lot; a statement that in his training and experience, evidence is sometimes found in vehicles; and the conclusion that he believes the car contains the evidence he seeks [Tr. at 34]. SA Leatham agreed that at the time he sought the search warrant for the hotel room, he did not ask the judge for permission to seize the car [Tr. at 36-37].

On redirect examination, SA Leatham stated that he informed the hotel desk clerk that Defendant was a suspect in a bank robbery investigation [Tr. at 37]. He agreed that Defendant's car was "eye-catching," because it was bright yellow [Tr. at 38].

Defendant called Jeffrey Davis, who is the front desk clerk at the Red Roof Inn at Kirby Road [Tr. at 40-41]. Mr. Davis testified that he was working on March 7, 2020, when law enforcement came to the Red Roof Inn looking for an individual with a Dodge Challenger parked in the parking lot [Tr. at 41]. He said that when a guest checks into the hotel, the front desk staff do not record information on the guest's car, and there is no way for him to associate a guest with a specific car [Tr. at 42]. He said he did not ask that Defendant's car be removed on the evening of March 7 [Tr. at 42]. Mr. Davis stated that the hotel would tow a car if it did not belong to a guest or someone visiting a guest or if it was abandoned on the hotel's property [Tr. at 42]. He said the staff determines that a vehicle is abandoned if it does not move after a few days [Tr. at 43]. He agreed the hotel staff tries to determine if the car belongs to a guest before it is towed and that it is rare for the hotel to have a car towed [Tr. at 43].

On cross-examination, Mr. Davis testified that when the FBI spoke with him on March 7, 2020, they told him they were looking for a suspect in some bank robberies [Tr. at 44]. He said that he is the sole employee on site between 3:00 p.m. and 11:00 p.m. [Tr. at 44-45]. He said at first, he encountered a few agents at the front of the hotel and that more officers gathered thereafter

9

[Tr. at 45]. He did not see law enforcement gathered by a certain vehicle, but he recalled an officer mentioned the suspect was driving a yellow Charger [Tr. at 45]. He was aware that law enforcement arrested Defendant that evening [Tr. at 46]. He agreed that individuals who were not guests or visiting guests could not park at the hotel [Tr. at 46]. He said he would not consider an individual arrested by law enforcement to be a guest and the hotel would want that individual's vehicle and belongings removed from the property [Tr. at 46-47]. He stated that the hotel staff would call a tow truck to have an arrested individual's car removed [Tr. at 47].

On redirect examination, Mr. Davis stated that if a guest was arrested for a crime, other than a crime against the hotel, the hotel staff would likely not tow the guest's car until after their checkout time [Tr. at 48]. He agreed that an arrested guest could have a family member pick up their car and that the hotel would likely not know about it [Tr. at 49].

The Government recalled SA Leatham to testify about the search of Defendant's cellular telephone. SA Leatham stated that that a Motorola smart cellular telephone was taken from Defendant's person at the time of his arrest on March 7, 2020 [Tr. at 53]. The cellphone was stored in the FBI's evidence control room [Tr. at 53]. On March 10, 2020, SA Leatham obtained a search warrant for the cellphone [Tr. at 53]. On March 11, 2020, SA Leatham submitted a request for the Computer Analysis Response Team ("CART") to examine and search the cellphone, and he included a copy of the search warrant with the request [TR. at 54]. The request was assigned to Forensic Examiner Leyton Adams [Tr. at 54].

On cross-examination, SA Leatham testified that the forensic examiner removed the Defendant's cellphone from the FBI storage for analysis on March 13, 2020 [Tr. at 54-55]. SA Leatham stated that the forensic examiner attempted to examine the cellphone and then returned it to FBI storage [Tr. at 55]. SA Leatham stated he knew that the forensic examiner subsequently

sent the cellphone to a headquarters unit that handles unlocking cellphones [Tr. at 55-56]. He agreed that the March 10 search warrant was the only search warrant for the Defendant's cellphone and that the warrant commanded that he execute it on or before March 24, 2020 [Tr. at 56].

The Government called Leyton Adams, who testified that he has worked as a digital forensic examiner for the FBI since August 2018 [Tr. at 57]. His duties are to extract data from digital evidence, analyze the data, and report his findings [Tr. at 57]. Mr. Adams testified that on March 13, 2020, he received Defendant Whipple's cellular telephone from evidence storage for analysis [Tr. at 59]. He stated that he began his search of the cellphone that day, March 13 [Tr. at 59]. He said he first made a physical inventory of the cellphone, then removed the SIM card and the SD card and extracted data from both cards [Tr. at 59]. Mr. Adams said when he tried to extract data from the cellphone itself, he found it was "passcode locked" [Tr. at 59]. He said he entered the Defendant's date of birth as the passcode but that did not unlock the cellphone [Tr. at 60].

Mr. Adams said when he could not unlock the cellphone, he submitted a request to the Electronic Device Analysis Unit, a FBI headquarters unit that unlocks cellphones, to unlock the Defendant's cellphone [Tr. at 60]. Mr. Adams identified a copy of his request for service [Exh. 6], dated March 13, 2020 [Tr. at 61]. Mr. Adams stated that the headquarters unit has tools that allow it to extract data safely [Tr. at 62]. He noted that if he attempted too many incorrect passwords, the cellphone could lock or break [Tr. at 62]. He said if he attempted to reprogram the cellphone, the data would likely be wiped [Tr. at 62].

Mr. Adams stated that after submitting that request, he analyzed the data from the SD card, looking specifically for a list of passwords [Tr. at 61]. The SD card contains a DCIM directory, which is the location where saved images are stored [Tr. at 62]. On March 27, 2020, Mr. Adams

checked the cellphone, along with the SIM card and SD card, back into the evidence storage room [Tr. at 61].

Mr. Adams testified that on Friday, November 13, 2020, he received an email from the headquarters unit stating that he could send the cellphone to the Tennessee Valley Regional Computer Forensics Laboratory ("RCFL") in Huntsville, Alabama, for unlocking [Tr. at 63]. He said the elapse of time from March to November was not unusual and that this was during the height of Covid-19 restrictions when the RCFL had limited staff working on site [Tr. at 63]. Mr. Adams stated that he told the evidence storage technician to ship the cellphone on Monday, November 16, 2020 [Tr. at 64]. He believed the RCFL received the cellphone the following day, November 17, 2020 [Tr. at 64]. According to the examiner's report, the RCFL examiner unlocked the cellphone and extracted data from it between November 18 and 19, 2020 [Tr. at 64]. Mr. Adams said on November 19, 2020, the RCFL sent the data extracted from the cellphone to him using an FBI internal file share [Tr. at 64-65]. The cellphone was shipped back to the Knoxville field office and returned to evidence storage [Tr. at 65].

Mr. Adams said that after he received the data from the Defendant's cellphone, he analyzed it and wrote a report documenting his findings [Tr. at 65]. He said he found a database for a Google maps application, which showed that Defendant had searched the term "bank" and received results for multiple banks in Knoxville, including the three banks in this investigation [Tr. at 65]. Mr. Adams stated that the search of the Defendant's cellphone began on March 13, 2020, and concluded when he wrote the report [Tr. at 66].

On cross-examination, Mr. Adams testified that the SIM card and SD card were items contained within the cellphone [Tr. at 67]. He said an SD card is not "completely necessary" for the cellphone to function but acts as an extension of the cellphone's storage [Tr. at 67]. He agreed

that a cellphone without an SD card could potentially do everything that a cellphone is designed to do [Tr. at 68]. Mr. Adams said if the cellphone is set up with the SD card installed, then removal of the SD card could cause problems in using applications that rely on data written to that SD card [Tr. at 68]. However, he said that if the cellphone was initially used without the SD card, the only problem caused by removal of the SD card would be the loss of storage space [Tr. at 68]. Mr. Adams disagreed that an SD card is like a removable drive in a desktop computer [Tr. at 69]. He said the SD card can be removed from the cellphone by removing the SIM tray with a paperclip [Tr. at 70]. Mr. Adams agreed that he extracted data from the SD card by inserting the SD card in another electronic device, before he attempted to unlock the cellphone [Tr. at 72-74].

Mr. Adams agreed that the function of the SIM card was to allow the cellphone to communicate with the carrier [Tr. at 70]. While SIM cards can store text messages or call logs, smart phones typically do not use SIM cards for storage, and Defendant's cellphone did not use the SIM card for storage [Tr. at 71]. Mr. Adams agreed that the Google maps data was stored on the cellphone's internal memory, not the SIM card or the SD card [Tr. at 71]. He acknowledged that he extracted data from the SIM card before he attempted to unlock the cellphone [Tr. at 73-74].

Mr. Adams testified that he could not access the Defendant's cellphone because he could not get past the passcode [Tr. at 74]. He said he retained the cellphone until March 27, while he analyzed the data from the SD card in the event that he found a list of passcodes [Tr. at 74-75]. He agreed that he could access the case file while working on his analysis of the cellphone [Tr. at 75]. He said he had access to the search warrant in the case file [Tr. at 76].

Mr. Adams stated that on November 13, 2020, he learned he could send the cellphone to Alabama [Tr. at 76]. Because he received that notice on a Friday, he could not have the cellphone

13

shipped that day, but the evidence technician sent it on Monday, November 16, 2020 [Tr. at 76]. He agreed that the cellphone was examined in Alabama on November 18 or 19 [Tr. at 77].

On redirect examination, Mr. Adams testified that when he first received the cellphone, the SIM card and SD card were inside it [Tr. at 77]. He used his tools to pop out the tray containing the SIM and SD cards [Tr. at 77-78]. Before removing the SIM and SD cards, he conducted a physical examination of the cellphone, noting any unique identifiers or damage and whether it had a case [Tr. at 78]. He agreed this physical examination is part of the initiation of the search of the cellphone [Tr. at 78]. He said he conducted the physical examination of the cellphone and removed the SIM and SD cards on March 13, 2020 [Tr. at 78-79]. Mr. Adams said he would not have conducted the physical examination of the cellphone or removed the SIM and SD cards without a search warrant [Tr. at 79].

## III.    FINDINGS OF FACT

The Court makes the following factual findings in this case:

On March 7, 2020, law enforcement requested information from Walmart security about the recent purchase of a red rain poncho and a tan Dickies brand jacket. The officers learned that someone purchased a rain poncho, manila envelopes, and black pens using the Walmart Pay application at 10:15 a.m., on March 2, 2020, which was three days before the first bank robbery under investigation. FBI Special Agent Wesley Leatham reviewed surveillance video from the day and time of that purchase and observed a heavy-set white male, who resembled the perpetrator of the bank robberies, enter a yellow Dodge Challenger. SA Leatham sent a subpoena to Walmart and learned the name and telephone number of the individual who made the purchase at 10:15 a.m., on March 2, 2020. The purchaser was Robert Whipple. A review of Tennessee driver's

14

license records revealed that a yellow 2018 Dodge Challenger, with license plate number CLN097, was registered to Robert Whipple.

Later that day, March 7, 2020, KPD officers found Whipple's yellow Challenger parked in the back parking lot of the Red Roof Inn. Law enforcement forcibly entered Whipple's hotel room, arrested him, and seized a Motorola cellphone from his person. SA Leatham instructed KPD officers to impound the Challenger, which was towed to the KPD impound lot. At 10:58 p.m., on March 7, SA Leatham obtained a federal search warrant for Whipple's hotel room. FBI agents searched the hotel room that night, seized evidence from the room, and returned the hotel key to the front desk clerk Jeffrey Davis.

On March 10, 2020, SA Leatham sought and obtained search warrants for the Challenger and Whipple's cellphone. Law enforcement searched the Challenger on March 11, 2020, and seized a red Ozark Trail poncho, a manila envelope with a robbery demand note written on the front, a package of unused manila envelopes, a Dickies jacket, a costume wig and beard, and evidence of controlled substances.

On March 11, 2020, SA Leatham submitted a request for a digital examination of Whipple's cellphone. On March 13, 2020, Forensic Examiner Leyton Adams checked the cellphone out of evidence and began the search by first conducting a physical examination of the cellphone. Mr. Adams removed the SIM card and SD card from the cellphone and extracted data from the cards. The cellphone was passcode protected. Mr. Adams attempted to unlock the cellphone by entering Defendant's date of birth as the passcode but was unsuccessful. That day, Mr. Adams submitted a request to unlock the cellphone to the Electronic Device Analysis Unit. He did not attempt additional passcodes but maintained custody of the cellphone until March 27,

while he examined the data from the SIM card and the SD card. Mr. Adams returned the cellphone with the SIM and SD cards to evidence storage on March 27, 2020.

On November 13, 2020, the Electronic Device Analysis Unit sent an email to Mr. Adams informing him that he could ship the cellphone to an FBI forensics laboratory in Huntsville, Alabama, to be unlocked. That day, Mr. Adams asked the evidence technician to ship the cellphone to the Huntsville forensics laboratory. The evidence technician shipped the cellphone on Monday, November 16, and the Huntsville laboratory received it on November 17, 2020. The Huntsville laboratory unlocked the cellphone on November 18 and extracted the data from the cellphone on November 18 and 19, 2020. On November 19, 2020, Mr. Adams received the data from the cellphone through an internal FBI file-sharing system. Thereafter, Mr. Adams analyzed the data from the cellphone and prepared a report.

## IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. To comport with the Constitution, searches must be pursuant to a warrant, which "shall issue[ only] upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* Defendant Whipple objects to the warrantless seizure of his Walmart purchasing data, the warrantless seizure of this car, and to the search of his cellphone beyond the time permitted by the search warrant. He also asks the Court to reopen the suppression hearing relating to the warrantless entry of his hotel room, arguing that the search warrant affidavit for the search of his hotel room was tainted by the forcible entry. The Court examines each of these issues in turn.

### A. Purchasing Data Obtained from Walmart

Defendant argues [Docs. 117 & 145] that he has a reasonable expectation of privacy in his purchasing data stored by Walmart. He asserts that his purchasing data, like location data from a cellular telephone, is personal, revealing, and comprehensive. He also argues that purchasing data along with account information such as one's name, address, and telephone number, is information that society reasonably expects will be private, particularly when such information is password protected. Thus, he contends that law enforcement violated the Fourth Amendment when they obtained his purchasing data from Walmart without a search warrant. He asks the Court to suppress all evidence stemming from the warrantless seizure of his purchasing data, including the identification of him and his car.

The Government responds [Doc. 118] that Defendant lacks a reasonable expectation of privacy in his customer information held by the Walmart Pay application. It contends that law enforcement properly used a federal grand jury subpoena to learn Defendant's name, address, and telephone number and that police did not gain information on Defendant's purchasing habits through the subpoena.

"When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' [the Supreme Court has] held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). In *Carpenter*, the Supreme Court held that law enforcement must get a search warrant to obtain cell site location data collected by a third party (the wireless carrier) from an individual's cellular telephone. *Id.* at 2221. The Court observed the seizure of cell site data lies at the intersection of case law recognizing a legitimate expectation of

17

privacy in one's movements and case law holding that one lacks an expectation of privacy in information voluntarily disclosed to third parties. *Id.* at 2214-15. The Court observed the comprehensive information revealed by cell site data exposes "the privacies of life." *Id.* at 2217. Thus, the cellular telephone user has a reasonable expectation of privacy in his location data, even though the user freely discloses this data to a third party. *Id.* at 2220.

Defendant asks the Court to extend the holding in *Carpenter* to purchasing data, arguing that the purchasing information tracked by companies such as Walmart similarly reveals the privacies of life and, thus, law enforcement should have to obtain a search warrant to access this data. However, an individual enjoys only a minimal expectation of privacy in data from commercial transactions. *United States v. Miller*, 425 U.S. 435, 442 (1976). In *Miller*, the government subpoenaed bank records, including cancelled checks, deposit slips, and monthly statements, in an investigation of tax evasion. *Id.* at 437-38. The Court held that the "nature" of these records, which were owned by the bank, not the defendant, showed defendant's diminished expectation of privacy, because the records "were not confidential communications but negotiable instruments to be used in commercial transactions," and the information contained therein was "exposed to [bank] employees in the ordinary course of business." *Id.* at 442, 425. In *Miller*, the Supreme Court held that in revealing his commercial transactions to the bank, the defendant assumed the risk that the bank would give the records to the government. *Id.* at 443.

*Carpenter* recognized that cell site data was "qualitatively different" from the bank records at issue in *Miller*. 138 S. Ct. at 2216-17. The Court determined that "individuals have a reasonable expectation of privacy in the whole of their physical movements" because society expects that police are not able to secretly surveil a person's every movement over long periods of time. *Id.* at 2217. The Court found that individuals carry their cellular telephones nearly all the time, giving

the government "near perfect surveillance" of the cellphone user. *Id.* at 2218. Additionally, cell site data allows the government to "travel back in time" to track the individual's past movements, limited only by the carrier's retention policies. *Id.* Finally, the Court observed any thought that cellphone users voluntarily turn their location information over to third-party carriers rings false, because cellphones are necessary to participate in daily life, cell site information is gathered without any affirmative act on the part of the cellphone user, and its collection cannot be avoided. *Id.* at 2220. In contrast, the Court found a "world of difference between the limited types of personal information addressed in . . . *Miller* and the exhaustive chronicle of location information casually collected by wireless carriers." *Id.* at 2219. It expressly limited its holding to cell site data and observed it was not altering the holding in *Miller*. *Id.* at 2220.

The undersigned finds that purchasing data is similar to the commercial transaction data in *Miller* and different from the cell site data in *Carpenter*. While purchasing data may also reveal very personal information about an individual, it does not reveal the whole of a person's movements like cell site data. Moreover, as noted by the Government, Defendant Whipple could have avoided the tracking of his purchasing information on the Walmart Pay application by using another payment method. Instead, Defendant chose to use the Walmart Pay application to make a purchase, thereby voluntarily providing his data to Walmart. The Court finds this transaction differs from the automatic collection of cell site data over which an individual has no control.

The Middle District of Tennessee declined to extend *Carpenter*'s holding for cell site data to transaction records gained by subpoena. *United States v. Frei*, No. 3:17-cr-00032, 2019 WL 189826, *3 (M.D. Tenn. Jan. 14, 2019). In *Frei*, law enforcement obtained defendant's account information and transaction history from his bank by subpoena to prove his interstate travel and to corroborate the victims' statements. *Id.* at *1. Like in the instant case, defendant relied on

19

*Carpenter* to argue the Fourth Amendment requires police to get a search warrant to obtain the records, which show his location at a particular time. *Id.* The court found the transaction records were covered by the third-party doctrine from *Miller*. *Id.* at 2. It determined that the information on defendant's location from the transaction records was "inherently different" from the comprehensive location information in cell site data. *Id.* The court also found a "significant difference in the degree of 'voluntary exposure' when choosing to use a bank card versus [cell site data], which is generated automatically." *Id.* at 3. "To create a bank record, an individual must choose to voluntarily participate in a commercial transaction with his or her bank card." *Id.* Finally, the court observed *Carpenter* expressly states that its holding does not change the analysis in *Miller*. *Id.* Thus, the court held that defendant had no expectation of privacy in his bank transaction records. *Id.* The Court finds the analysis in *Frei* applies to the purchasing data Defendant Whipple seeks to suppress.

Here, the Government contends that law enforcement did not gain Defendant Whipple's purchasing *history* through its grand jury subpoena to Walmart Pay. This is correct. SA Leatham testified that he sought transaction data from the March 2, 2020 purchase and subscriber data for the individual making that purchase from Walmart Pay through a grand jury subpoena [Doc. 137 at p.12]. He stated that in response to the subpoena, law enforcement received a copy of the receipt from the March 2, 2020 purchase [Exh. 1] and subscriber information, identifying Defendant Whipple as the person who made the March 2 purchase and giving his address and telephone number [Exh. 2, Doc. 137 at p.12]. SA Leatham denied requesting a "general purchase history" associated with that account, reiterating that law enforcement "requested transactional data specific to that purchase" [Doc. 137 at 13]. He said Walmart also provided two receipts and surveillance video to law enforcement on site. Thus, the Court finds that law enforcement did not

request or obtain Defendant's entire purchase history through the grand jury subpoena. Instead, the only transactional data it obtained through the subpoena was a copy of the receipt from March 2, 2020, at 10:15 a.m. [Exh. 1].

Moreover, the Court finds that law enforcement likely already had a copy of this receipt from Walmart security at the time it requested the administrative subpoena. Defendant does not challenge law enforcement's initial investigation at Walmart, from which it learned of the purchase of a red poncho and manilla envelopes at 10:15 a.m., on March 2, 2020, and viewed the surveillance video from that day and time. In *Carpenter*, the Court was clear that its holding on cell site data did not "call into question conventional surveillance techniques and tools, such as security cameras." 138 S. Ct. at 2220.

Finally, Defendant challenges law enforcement's use of a subpoena to obtain the customer information linked to the March 2, 2020 purchase, arguing that the Stored Communications Act does not apply to Walmart, because it is not engaged in the storage or processing of electronic communications. The Stored Communications Act requires a "provider of electronic communication service or remote computing service" to disclose customer information, such as the name, address, and telephone number, to "a governmental entity"[3] pursuant to an administrative or grand jury subpoena. 18 U.S.C. § 2703(c)(2). Not every entity that stores data electronically is covered by the Stored Communications Act. Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It*, 72 Geo. Wash. L. Rev. 1208, 1214-15 (2004). Electronic communication services allow users "'to send or receive wire or electronic communications'" and hold communications in temporary or intermediate storage. *United States v. Warshak*, 631 F.3d 266, 282 (6th Cir. 2010) (quoting 18 U.S.C. § 2510(15)).

---

[3] A "governmental entity" includes a federal agency, such as the FBI. 18 U.S.C. § 2711(2).

Remote computing services "'provide computer storage or processing services' to customers and are designed for longer-term storage." *Id.* at 283 (quoting 18 U.S.C. § 2711(2)). "Walmart Pay is a free feature in the Walmart mobile app for Android and iOS that easily allows for quick and secure payment with your mobile device in Walmart stores, at any register" [Doc. 118-3, Instructions to Set Up Walmart Pay]. Based on these definitions, the Court questions whether a mobile payment application like Walmart Pay can be considered either an electronic communications service or a remote computing service.[4]

However, grand jury subpoenas for records are not exclusively authorized by the Stored Communications Act. "[A] subpoena to appear before a grand jury is not a 'seizure' in the Fourth Amendment sense[.]" *United States v. Dionisio*, 410 U.S. 1, 9 (1973). However, the "Fourth Amendment provides protection against a grand jury subpoena duces tecum too sweeping in its terms 'to be regarded as reasonable.'" *Id.* at 11 (quoting *Hale v. Henkel*, 201 U.S. 43, 76 (1906)). The undersigned finds the grand jury subpoena in the instant case was narrowly drawn, seeking only information on a single transaction on March 2, 2020, and the identification (name, address, and telephone number) of the purchaser. Thus, the Court finds that the subpoena to Walmart Pay for records of a particular transaction and identification of the purchaser was reasonable in scope and does not run afoul of the Fourth Amendment.

Defendant Whipple asks the Court to hold that a search warrant is required to access customer identifying information from an electronic payment application. The Court finds Defendant's proposed extension of *Carpenter* is not well taken based on Supreme Court precedent

---

[4] The Government did not file a responding post-hearing brief and, thus, offered no response to Defendant's argument that the Stored Communications Act did not authorize the grand jury subpoena issued to Walmart Pay.

on the third-party doctrine.  Accordingly, the Court finds the Defendant's motion to suppress evidence obtained from the grand jury subpoena to Walmart Pay should be denied.

### B. Warrantless Seizure of Automobile

Defendant asks [Doc. 112] the Court to suppress all evidence found within his Dodge Challenger, because law enforcement seized the vehicle without a warrant and in the absence of exigent circumstances.  He contends that the officers knew the location of the car, which was parked off the street.  Defendant argues that the car was not contraband, evidence of a crime, or subject to forfeiture.  He maintains that law enforcement could have obtained a search warrant for the car that night, as they did for the hotel room, and that the warrantless seizure and three-day detention of the car is unreasonable.  The Government responds [Doc. 125] that the officers' investigatory seizure and control of the Challenger for three days until they obtained a search warrant was reasonable given the totality of the circumstances.  Alternatively, it argues that law enforcement properly seized the car under the automobile exception to the warrant requirement and that law enforcement would have inevitably discovered the evidence contained within the Challenger pursuant to a valid search warrant executed in good faith.

In the instant case, the Court examines the narrow question of whether the officers could seize and impound Defendant Whipple's car without a warrant and hold the car for three days, while obtaining a search warrant for the car.  As stated above, the Fourth Amendment protects against unreasonable searches and seizures.  Warrantless seizures are "'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  "Where law enforcement authorities have probable cause to believe that a container *holds* contraband *or evidence of a crime*, but have not secured a warrant, the Court

has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it *or some other recognized exception to the warrant requirement is present*." *United States v. Place*, 462 U.S. 696, 701 (1983) (emphasis added). In the instant case, the Court finds the automobile exception to the warrant requirement applies and permitted the seizure and impounding of the Challenger while SA Leatham sought a search warrant.

The automobile exception permits the warrantless seizure and search of an automobile based upon probable cause that it contains contraband, due to the vehicle's easy mobility, as well as its pervasive regulation, which diminishes the expectation of privacy. *California v. Carney*, 471 U.S. 386, 390-92 (1985). The automobile exception also applies if law enforcement has probable cause to believe the vehicle contains evidence of a crime. *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011). Application of the automobile exception "turn[s] on the ready mobility of the vehicle, and on the presence of the vehicle in a setting that objectively indicates that the vehicle is being used for transportation." *Carney*, 471 U.S. at 394. The automobile exception does not require a showing of exigency. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *Galaviz*, 645 F.3d at 355. Here, the Court finds the Challenger was readily mobile and parked in a hotel parking lot, which the Court finds is a location indicating the vehicle is being used for transportation.

Defendant raises two challenges to the application of the automobile exception: First, he argues that the Challenger was not readily mobile, because he had been arrested. Second, he argues that the Challenger was not contraband, was not evidence of a crime, and was not subject to forfeiture. In response to the Defendant's first argument, it is well settled that "the automobile exception is justified not only by the exigency created by the 'ready mobility' of vehicles, but also

by the lesser expectation of privacy operators have in their vehicles." *United States v. Smith*, 510 F.3d 641, 650 (6th Cir. 2007) (citing *Carney*, 471 U.S. at 391). Thus, our appellate court "has upheld warrantless automobile searches in which officers were in control of both the keys to the vehicle and the operator of the vehicle." *Id.* (holding officers properly searched car parked on street pursuant to the automobile exception, although they had the owners in custody and possession of the keys); *United States v. Graham*, 275 F.3d 490, 508-11 (6th Cir. 2001) (upholding search of defendant's truck parked outside a trailer pursuant to the automobile exception, although officers had arrested defendant and had possession of his keys), *cert. denied*, 535 F3d 460 (2002). In the instant case, the fact that Defendant was in custody does not preclude the application of the automobile exception.

Defendant also asserts that the automobile exception does not apply in this case because the Challenger itself was not contraband, evidence of a crime, or subject to forfeiture. However, as stated above, law enforcement may seize a container without a warrant, when law enforcement has probable cause to believe the container holds evidence of a crime and an exception to the Fourth Amendment warrant requirement applies. *Place*, 462 U.S. at 701. Here, SA Leatham had probable cause to believe the Challenger contained evidence of the three bank robberies. SA Leatham knew the Challenger was Defendant's car and that Defendant had used the Challenger when purchasing items used in the bank robberies, such as the red poncho and the manila envelopes. Defendant was an overnight guest at a hotel, was arrested in his hotel room, and had $530 on his person at the time of his arrest. SA Leatham knew that around $7,000 was stolen in the three bank robberies. Thus, the Court finds that SA Leatham reasonably believed it was likely that the Defendant's Challenger contained money stolen in the robberies and items used in the robberies. The Court finds that SA Leatham had probable cause to believe the Challenger

contained evidence of the robberies and properly seized the Challenger pursuant to the automobile exception.

After finding the warrantless seizure of the Challenger was lawful pursuant to the automobile exception, the Court examines whether the scope of the warrantless seizure (impounding for three days) was reasonable. The Supreme Court has found no constitutional distinction between seizing a vehicle and holding it while police obtain a search warrant based on probable cause and searching it "on the spot" based on probable cause. *Cardwell v. Lewis*, 417 U.S. 583, 593-94 (1974) (citing *Chambers v. Maroney*, 399 U.S. 42, 52 (1970)). In *Lewis*, the trial court found police had probable cause to believe the defendant's car was used in the commission of a crime. *Id.* at 586-87. Law enforcement arrested defendant when he came to the police station for questioning; impounded his car, which was parked in a public parking lot near the police station; and examined the car the following day. *Id.* at 587-88. Relying on its earlier decision in *Chambers*, the Court found that a car that could be searched immediately without a warrant could also be seized until a warrant was obtained. *Id.* at 594; *see also Chambers*, 399 U.S. at 52 (determining that due to the car's mobility, "the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured"). The Court observed that impounding the car for later examination or search "facilitated . . . close examination" and could provide for more favorable conditions to conduct the search than at the time of seizure. *Lewis*, 417 U.S. at 595.

Finally, in *Lewis*, as here, the defendant argued that exigent circumstances did not require the seizure and detention of the car. *Id.* However, the Court rejected this argument, holding "we know of no case or principle that suggests that the right to search on probable cause and the

reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment." *Id.*

In the instant case, the Challenger was seized and towed to the KPD impound lot around 10:00 p.m., on Saturday, March 7, 2020. SA Leatham drafted an affidavit in support of a search warrant for the car on the following day, which was a Sunday. SA Leatham obtained the search warrant on Tuesday, March 10, and executed the search warrant the next day. Defendant argues that the three-day detention of the Challenger without a warrant was unreasonable. He contends that SA Leatham could have sought a search warrant for the Challenger on the night of March 7, as he did for the hotel room. Defendant maintains that the affidavit in support of the search warrant for the Challenger was basically the same as the affidavit for the hotel room. He argues that officers could have guarded the Challenger until a search warrant was obtained, as they did the hotel room, and that the officers could have seized the car pursuant to the search warrant and searched it in more favorable conditions following that seizure. However, the Court finds the fact that it was possible for the officers to obtain a search warrant for the car that night does not mean they had to do so when they could also properly seize the automobile without a warrant pursuant to the automobile exception. *United States v. Hofstatter*, 8 F.3d 316, 322 (6th Cir. 1993) (upholding warrantless search of car pursuant to the automobile exception, although officers had time to get a search warrant), *cert denied*, 510 U.S. 1131 (1994).

Ultimately, the Court must determine whether law enforcement's detention of the vehicle for three days while obtaining a search warrant was reasonable under the circumstances. Here, the Court finds that it was. First, it was reasonable for law enforcement to impound the vehicle to preserve it for a later search in daylight in a secure location. Although the hotel did not require that the Challenger be moved on the evening of Defendant's arrest, the hotel clerk acknowledged

that a family member of Defendant could have moved the car. Second, the Court finds that SA Leatham was working toward obtaining the search warrant and conducting additional investigation during the days until he obtained the search warrant. Finally, the Court finds that unlike in *United States v. Place*, in which the Supreme Court held an investigatory detention of an airline passenger's luggage for ninety minutes was unreasonable, here SA Leatham had probable cause to believe the Challenger contained evidence of the bank robberies.

In *Place*, the officers had reasonable suspicion to believe the passenger's luggage contained narcotics, detained the passenger's luggage at the airport for ninety minutes until a drug dog alerted on the luggage, and then retained the luggage over the weekend, until they obtained a search warrant on the following Monday morning. 462 U.S. at 699. The Court held that while a brief investigatory detention of the luggage to investigate the officer's suspensions was permissible, the detention must be "limited in scope." *Id.* at 706. The Court found the ninety-minute detention of the luggage was unreasonable "in the absence of probable cause," because the detention was far longer than that permitted in a *Terry* stop and law enforcement did not diligently investigate their suspicion that the bags contained drugs. *Id.* at 709-10. In contrast, in the instant case, SA Leatham had probable cause to believe the Challenger contained evidence of the bank robberies at the time he directed that the car be impounded. Thus, the Defendant's reliance on *Place* to argue that the Fourth Amendment required a search warrant to impound the Challenger is misplaced.

In summary, the Court finds that law enforcement properly seized the Defendant's car pursuant to the automobile exception. The Court also finds that the nearly three-day lapse in time between seizing the vehicle on Saturday night and the issuance of a search warrant on Tuesday afternoon[5] was reasonable, given that SA Leatham was diligently investigating the case and

---

[5] The search warrant for the Challenger was issued at 3:45 p.m. on March 10, 2020 [Doc. 112-3]. The search warrant permitted law enforcement to search the car on or before March 24, 2020.

seeking the search warrant. Accordingly, the Court finds that Defendant's motion to suppress the evidence seized from his car should be denied.

## C. Execution of Search Warrant for Cellphone

Defendant asks [Doc. 115 & 146] the Court to suppress all evidence obtained from the unlawful search of his cellular telephone. He argues that the FBI accessed the data from the cellphone on November 18, 2020, which was after the search warrant expired on March 24, 2020. He contends that the search of the SD card was separate from the search of his cellphone, which did not begin until more than seven months after the expiration of the search warrant. He asserts that the existence of a passcode on his cellphone was not an unexpected obstacle and the delay in the search of his cellphone was unreasonable. Thus, he argues that law enforcement seized data from his cellphone without a warrant.

The Government responds [Doc. 114] that the FBI began the search of Defendant's cellphone on March 13, 2020. It asserts that the "reasonable continuation rule" allowed law enforcement to continue searching Defendant's cellphone beyond the fourteen-day period, because the phone was locked with a passcode, an obstacle that impeded law enforcement's access to the data. Alternatively, it contends that the Court should not apply the exclusionary rule to suppress the data seized from the cellphone, because it would not deter police misconduct and would result in a substantial cost to justice.

The March 10, 2020 search warrant for Defendant's cellular telephone gives the following description of the property to be searched:

> One (1) black Motorola, model XT1962-1 smartphone, with the name "Rob Whipple" displayed on the lock screen of the phone when powered on, which was seized from the person of Robert Z. Whipple III, incident to arrest on March 7, 2020. The phone is

_____

Thus, the execution of the search warrant on the following day, March 11, 2020, was well within the time permitted by the warrant.

> currently in possession of the Federal Bureau of Investigation ("FBI") stored at the Knoxville Field Office, . . . .
>
> This warrant authorizes the forensic examination of the aforementioned cellular telephone for the purpose of identifying the electronically stored information described in Attachment B.

[Doc. 115-1, Attachment A to Search Warrant]. The search warrant authorized law enforcement to search "any time in the day or night" and to execute the warrant on or before March 24, 2020 [Doc. 115-1, Search Warrant]. The following day, March 11, 2020, SA Leatham submitted a request for a digital examination of the cellphone. On March 13, 2020, Forensic Examiner Leyton Adams checked the cellphone out of evidence and began the search by first conducting a physical examination of the cellphone. Mr. Adams removed the SIM card and SD card from the cellphone and extracted data from both cards. Mr. Adams attempted to unlock the cellphone by entering Defendant's date of birth as the passcode but was unsuccessful. That day, Mr. Adams submitted a request to unlock the cellphone to the Electronic Device Analysis Unit. He did not attempt additional passcodes but maintained custody of the cellphone until March 27, while he examined the data from the SIM card and the SD card, specifically looking for a list of passwords.

On Friday, November 13, 2020, Mr. Adams received instruction from the Electronic Device Analysis Unit to ship the cellphone to an FBI forensics laboratory in Huntsville, Alabama, to be unlocked. The cellphone was shipped on the following Monday, November 16, and the Huntsville laboratory received it on November 17, 2020. The Huntsville laboratory unlocked the cellphone on November 18 and extracted the data from the cellphone on November 18 and 19, 2020. On November 19, Mr. Adams received the data from the cellphone through an internal FBI file-sharing system. Thereafter, Mr. Adams analyzed the data from the cellphone and prepared a report.

Law enforcement must obtain a search warrant to search a cellular telephone seized incident to an arrest. *Riley v. California*, 573 U.S. 373, 403 (2014). A search warrant "must command" an authorized officer to "execute the warrant within a specified time no longer than 14 days[.]" Fed. R. Crim. P. 41(e)(2)(A)(i). With regard to electronically stored information, "the time for executing the warrant . . . refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review." Fed. R. Crim. P. 41(e)(2)(B). Defendant argues that a search warrant only permits one entry into the subject of the search and that police should have obtained a second search warrant to access the data on his cellphone in November 2020.

Generally, a search warrant authorizes a single search of the premises that is the subject of the warrant. *United States v. Keszthelyi*, 308 F.3d 557, 568-69 (6th Cir. 2002). Our appellate court has recognized that the repeated search of an electronic device properly seized as evidence in a case does not run afoul of this rule, which was created in the context of searches of residences. *United States v. Castro*, 881 F.3d 961, 967-68 (6th Cir. 2018). "Officers may conduct a more detailed search of an electronic device after it was properly seized so long as the later search does not exceed the probable cause articulated in the original warrant and the device remained secured." *Id.* at 967. This rule applies "even if the officers conducted an initial search soon after the device's seizure but waited months or years to conduct a more intensive search." *Id.* (affirming FBI's extensive search of cellphone without a new search warrant nearly one year after state officers seized the phone and performed a cursory search pursuant to a search warrant).

In the instant case, the Court finds that Mr. Adams began the search of the Defendant's cellphone on March 13, 2020, when he inspected the outside of the cellphone and extracted data from the SIM and SD cards. When he was not able to unlock the cellphone, Mr. Adams sent it to

be unlocked at a separate FBI laboratory. At all times, the cellphone remained secured, and the extraction of data from the cellphone in November 2020 for examination by Mr. Adams did not exceed the scope of the search permitted by the search warrant. Following the analysis of our appellate court in *Castro*, the Court finds the extraction of data from Defendant's cellphone in November 2020 did not violate the Fourth Amendment.

Defendant argues that a search of the SD card was separate from a search of the internal memory of the cellphone and, thus, the search of the cellphone did not begin until the phone was unlocked in November 2020. Thus, he maintains that the only search of his cellphone occurred after the expiration of the search warrant. The Court disagrees and finds that a search of the data on the SD card was part of the search of the cellphone. Mr. Adams testified that the SD card was located inside the cellphone at the time he retrieved the phone from evidence and that he removed the SD card from the phone. Mr. Adams testified that an SD card provides extra storage space for a cellphone. Attachment B to the search warrant for Defendant's cellphone, lists the items to be seized and provides that "the terms 'records' and 'information' include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored" [Doc. 115-1, p.3]. Accordingly, the Court finds that the search warrant for the Defendant's cellphone permitted seizure of data stored either on the cellphone's internal memory or on the SD card installed inside the cellphone. The Court finds that the SD card, which was installed inside the cellphone at the time it was seized, is a component part of the cellphone. *See United States v. Wilson,* No. 17-04106-01-CR-C-SRB, 2019 WL 4740509, *4 (W.D. Mo. Sept. 27, 2019) (holding search warrant for cellular telephone included installed micro SD card, because SD card "amounted to a component part of the HTC phone") (Report and Recommendation adopted); *see also United States v. Archambault*, No. 13–CR–100–A(Sr), 2014 WL 6908884, *4-5 (WDNY

Dec. 9, 2014) (holding consent to search cellular telephone extended to SD card installed inside phone) (Report and Recommendation adopted).

Moreover, even if the FBI was not allowed to conduct repeated searches of Defendant's cellphone to extract data (as opposed to repeated review of the data once extracted), the Court finds that the November 2020 extraction of data was permissible as a continuation of the initial search on March 13, 2020. "[A] single search warrant may authorize more than one entry into the premises identified in the warrant, as long as the second entry is a reasonable continuation of the original search." *Keszthelyi*, 308 F.3d at 568. This "reasonable continuation" rule does not give law enforcement "unlimited access" to the premises that is the subject of the search warrant throughout the fourteen-day "life of the warrant." *Id.* For the reasonable continuation rule to apply two factors must be present: (1) "the subsequent entry must indeed be a continuation of the original search, and not a new and separate search," and (2) "the decision to conduct a second entry to continue the search must be reasonable under the totality of the circumstances." *Id.* at 569. In *Keszthelyi*, the Court held the second entry into the residence on the following day was a separate search, because the initial search of the residence was thorough and complete, the agents' ability to execute the warrant fully was not impaired, the agents did not reasonably believe the home contained undiscovered evidence at the time of the second entry, and the second search was not limited in scope or intrusiveness. *Id.* at 571-73.

The reasonable continuation rule has been applied to the search of a cellular telephone. "When a search pursuant to a valid warrant begins within the required time period, but extends beyond the expiration of the warrant, courts have applied a 'reasonable continuation' rule." *United States v. Gaither*, No. 17-15-DLB-CJS, 2018 WL 1033457, *9 (E.D. Ky Feb. 22, 2018). In *Gaither*, the court upheld the search of defendant's cellphone, which was started within fourteen

days of issuance of search warrant but concluded one day after the expiration of warrant. *Id.* The court found the continuation of the search after the expiration of the warrant was reasonable, because law enforcement "encountered an obstacle that impeded their access," i.e., their software was not compatible with the cellphone and the phone had to be searched manually. *Id.* Moreover, the court found law enforcement's continuation of the search beyond the fourteen-day period did not prejudice the defendant and was a technical, rather than purposeful, violation of the fourteen-day time-period required by Federal Rule of Criminal Procedure 41. *Id.* at *10.

In the instant case, the Court also finds that the extraction of the data from Defendant's cellphone nearly eight months after the expiration of the fourteen-day search period permitted by the warrant was a reasonable continuation of Mr. Adams's initial search of the cellphone. First, the Court finds that the extraction of data from the cellphone in November 2020 was a continuation of the search began by Mr. Adams on March 13, 2020. Mr. Adams was not able to complete his search of the cellphone in March, because the cellphone was locked, preventing him from extracting data from the cellphone's internal memory. At the time the data was extracted on November 18 through 19, 2020, law enforcement had not searched it. Thus, the FBI still had probable cause to believe the data contained evidence of the bank robberies.

Second, like the officers in *Gaither*, Mr. Adams encountered an impediment to concluding the search within the fourteen days permitted by the search warrant. Defendant contends the fact that the cellphone was locked was not an unexpected impediment, because law enforcement knew the phone had a lock screen when they sought the search warrant and Mr. Adams knew the cellphone was locked when he examined it on March 13, 2020, eleven days before the search warrant expired. However, the Court finds that the question is not whether the impediment was unexpected but, instead, whether the decision to extend the search to permit the phone to be

unlocked safely was reasonable under the circumstances. As discussed below, the Court finds that it was.

The Court also finds that Mr. Adams's decision to send the cellphone to the Electronic Device Analysis Unit to be unlocked was reasonable under the totality of the circumstances. Mr. Adams attempted to unlock the phone using Defendant's date of birth but was unsuccessful. He testified that attempting multiple passcodes could destroy the data. Additionally, the delay in the extraction of data from Defendant's cellphone did not prejudice Defendant Whipple. The cellphone was seized as evidence in this case and continues to be held as evidence to date. Thus, the delayed extraction of data did not interfere with Defendant's use or possession of the cellphone. Finally, the extraction of data in November 2020 was the same in scope and intrusiveness as the search permitted by the search warrant. Accordingly, the Court finds that the extraction of data from Defendant's cellular telephone in November 2020 was permitted by the reasonable continuation rule. The Defendant's motion to suppress the evidence obtained from his cellular telephone should be denied.

### D. Reopening Suppression Hearing on Search of Hotel Room

Defendant asks [Doc. 116] the Court to reopen the evidence from the July 27, 2020 evidentiary hearing to permit him to impeach the testimony of SA Leatham that he did not see the clothing on the floor of the Defendant's hotel room during the forced entry. Defendant argues that the undersigned credited SA Leatham's testimony that he did not see any items of clothing on the floor of Defendant's hotel room during the entry of the hotel room to arrest Defendant. He contends that despite prior counsel's objection that SA Leatham must have seen the clothing during his initial entry into the hotel room, the District Judge held there was no evidence to contradict the undersigned's determination that SA Leatham's testimony was credible. Defendant, now

represented by new counsel, argues that the March 12, 2020 report of FBI Special Agent Paul Hughes ("SA Hughes") contradicts SA Leatham's testimony, stating "[w]hile FBI agents and Knoxville Police Department Investigators were in the room effecting the arrest of Whipple, laying in plain view, were articles of clothing which appeared to match items of clothing worn by Whipple during the bank robberies" [Doc. 116-1]. Defendant argues that it is necessary to reopen the suppression hearing and permit consideration of SA Hughes's report for him to have a full and fair determination of his motion to suppress items seized from his hotel room.

The Government opposes [Doc. 122] Defendant's motion to reopen the suppression hearing, arguing that SA Hughes's report does not contradict SA Leatham's testimony and that, even if it did, it is not relevant to the Court's ultimate ruling on the suppression issue. The Government contends SA Leatham was only in the hotel room for a short time, while arresting Defendant, before leaving to seek the search warrant. It contends the fact that other officers, such as SA Hughes saw the clothing in plain view, does not contradict SA Leatham's testimony that he did not. More importantly, the Government points out that the District Court held that disregarding the information from the initial entry into the hotel room, the issuing judge had probable cause to issue the search warrant.

Defendant previously moved to suppress all evidence seized following the warrantless entry of his hotel room on March 7, 2020, as well as all subsequent evidence derived from this search [Doc. 35]. The Court held an evidentiary hearing on July 27, 2020, at which SA Leatham testified to the investigation of the three bank robberies and the arrest of Defendant Whipple in his hotel room on March 7, 2020. The undersigned found that the forced entry into the Defendant's hotel room violated the Fourth Amendment [Doc. 50]. However, the Court recommended that the Defendant's motion to suppress be denied, finding that SA Leatham's affidavit provided probable

cause for the issuance of the search warrant for the search of the hotel room, excluding the information gained after the entry of the hotel room [Doc. 50]. The Court found the remaining information in the affidavit constituted an independent source, supporting the search of the hotel room. Defendant argued that SA Leatham's observations during the illegal entry into the hotel room tainted his descriptions of the robberies throughout the affidavit. However, the Court credited SA Leatham's testimony that he did not see any specific items of clothing during the forced entry into the hotel room.

District Judge Varlan accepted the Report and Recommendation in whole and denied Defendant's motion to suppress [Doc. 65]. The Court noted Defendant's objection to the credibility of SA Leatham's testimony that he did not see the clothing during the initial illegal entry but held

> contrary to defendant's argument, the question is not "whether SA Leatham or others had seen the pile of men's clothing in the far corner of the hotel room where Defendant was standing when they entered" [Doc. 55 p. 3]. Instead, the question is whether the government has shown that (1) the initial entry prompted officers to seek the search warrant, and (2) even disregarding information obtained from the initial entry, whether a neutral magistrate would have still issued the search warrant. *United States v. Williams*, 656 F. App'x 751, 753 (6th Cir. 2016) (citing *Murray*[ *v. United States*], 487 U.S. [533,] 542[ (1988); ]*United States v.*] *Jenkins*, 396 F.3d [751,] 758, 761[ (6th Cir. 2005)]).

[Doc. 65, p.4-5]. Judge Varlan found that the warrant mentions items from the bank surveillance video footage and the information from the Walmart Pay application, which supports a finding that the decision to seek the search warrant was not based on information gained in the illegal entry. He also concluded that, setting aside the information in the affidavit gained during the illegal entry, the affidavit still provides a substantial basis for finding probable cause to issue the

search warrant. Thus, Judge Varlan concluded that an independent source existed for the evidence seized pursuant to the search warrant [Doc. 65, p.8].

Whether to reopen the evidence at a suppression hearing is a matter left to the Court's discretion; however, the Court should not reopen the evidence without careful consideration. *United States v. White*, 455 F. App'x 647, 650 (6th Cir.) (observing that a court should be "reluctant" to reopen the proof at a suppression hearing), *cert. denied*, 567 U.S. 943 (2012). In this regard, "the party seeking to reopen must provide a reasonable explanation for failing to present the evidence initially." *Id.* at 651. If the party seeking to reopen overcomes that hurtle, the Court considers the following factors: "the timeliness of the motion, the character of the testimony, the effect of granting the motion, and whether the opposing party will be prejudiced by reopening[.]" *Id.*

In the instant case, Defendant has provided no explanation of why he could not have presented SA Hughes's report, which was provided to Defendant in discovery, at the July 27, 2020 evidentiary hearing. The only explanation proffered is that Defendant now has new counsel. Generally, a change in counsel does not afford a defendant the opportunity to relitigate matters that have already been settled in the case. *See United States v. Neal*, No. 3:11-CR-69, 2012 WL 529553, *2 (E.D. Tenn. Feb. 17, 2012) (Shirley, MJ) (observing "motions that prior counsel had both the opportunity and the obligation to raise before the motion deadline cannot be raised by new counsel"). Moreover, the Court finds that SA Hughes's report does not contradict SA Leatham's testimony that he did not notice the clothing while he was in the Defendant's hotel room and before he left to seek the search warrant.

Defendant asserts that this Court has previously permitted the reopening of a suppression hearing to permit "successor counsel . . . to introduce clear proof that a witness' testimony on a

relevant point is inaccurate in order to reach a fair determination of a suppression issue" [Doc. 116, p.2]. However, the instant report of SA Hughes is not "clear proof" that SA Leatham saw the clothing on the floor of the hotel room. More importantly, it does not illuminate a "relevant point" in the suppression analysis. The Court agrees with the Government that impeaching SA Leatham's credibility on the issue of whether he saw the clothing on the floor of the hotel room would not affect the District Judge's ruling. Judge Varlan found an independent source, separate from evidence observed inside the hotel room by any of the officers, provided probable cause to issue the search warrant. After careful consideration, the Court finds that permitting the reopening of the July 27, 2020 evidentiary hearing and considering SA Hughes's report would not change the Court's ruling on the Defendant's motion to suppress the evidence seized from the hotel room. Thus, the Defendant's Motion to Reopen Suppression Hearing [Doc. 116] should be denied.

## V.      CONCLUSION

After carefully considering the parties' filings and arguments, the evidence and exhibits presented, and the relevant legal authorities, the Court finds the use of Defendant's Walmart Pay information, the search of the Defendant's car, and the search of Defendant's cellular telephone all comport with the Fourth Amendment. The Court also recommends the District Judge not exercise her discretion to reopen the July 27, 2020 evidentiary hearing on Defendant's motion to suppress items seized from his hotel room. For the reasons set forth herein, the undersigned

**RECOMMENDS** that Defendant's motions to suppress evidence and his motion to reopen the suppression hearing [Docs. 112, 115, 116, & 117] be **DENIED**.[6]

Respectfully submitted,

Bruce Guyton

United States Magistrate Judge

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).